INDIAN COFFEE CORP. and Penn-Western Food Corp., Plaintiffs,

v.

The PROCTER & GAMBLE COMPANY and The Folger Coffee Company, Defendants.

Civ. A. No. 76–1362.

United States District Court, W. D. Pennsylvania.

Jan. 16, 1980.

See also, D.C., 482 F.Supp. 1098.

John L. Laubach, Jr., Stevens, Clark, Laubach & Semple, Pittsburgh, Pa., for plaintiffs.

William Alvah Stewart, III, Cloyd R. Mellott, John W. Ubinger, Jr., Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa.

John W. Beatty, Edward W. Merkel, Jr., Mark Silbersack, Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, for defendants.

## OPINION

DIAMOND, District Judge.

Plaintiffs, Indian Coffee Corp. (Indian) and its wholly-owned subsidiary, Penn-Western Food Corp., (Penn-Western) filed this suit alleging that the defendants, The Procter & Gamble Company (Procter & Gamble) and its wholly-owned subsidiary, The Folger Coffee Company (Folger) violated § 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), by granting discriminatory prices in the sale of Folger's brand coffee in the Cleveland-Pittsburgh market area during 1971–74. In the context of a motion for partial summary judgment, the defendants present the court with a Robinson-Patman question which apparently has never been squarely addressed by the federal courts or the Federal Trade Commission (Commission): Whether a common marketing device known as a "consumer coupon" is an element of "price" under § 2(a) of Robinson-Patman. For the reasons set forth below, we conclude that the consumer coupons as utilized by the defendants in this case were not such an element of "price", and, accordingly, we will grant the defendants' motion for partial summary judgment.

## I. FACTUAL BACKGROUND

Prior to 1971, the nation's two largest suppliers of coffee, Folger and the General Foods Corp. (General Foods), split the country's coffee market geographically. General Foods, marketing Maxwell House, Sanka, Yuban, Brim, and Max-Pax, was firmly entrenched as the dominant seller in the eastern United States; whereas Folger, marketing Folger's brand, enjoyed a similar status in the western states. In 1971 Folger undertook a marketing campaign designed to challenge General Foods' eastern domination. As part of that campaign, Folger initiated a series of promotions in the Cleveland-Pittsburgh market area from 1971 until March of 1974. These promotions were undertaken on two distinct levels—trade and consumer. Promotions to the retailers included, inter alia, price discounts, trade coupons, advertising allow-

ances, and display allowances, and were designed to encourage retailers (hence "trade" promotions) to buy and prominently feature Folger's coffee. Consumer promotions were aimed directly at the consumer, and included free samples, refunds, premium offers, and the herein disputed consumer coupons. These were designed directly to increase consumer use of Folger's coffee.

Plaintiffs allege that at the time Folger initiated its promotional campaign in the Cleveland-Pittsburgh area, plaintiffs, who traded only in the Cleveland-Pittsburgh area, enjoyed a substantial and profitable business selling their brands of coffee in that region. In April of 1974, however, plaintiffs sold their coffee interests, allegedly because of defendants' predatory pricing practices. Thereafter, plaintiffs brought the instant suit against defendants charging that they violated the anti-price discrimination provisions of § 2(a) of Robinson-Patman by selling Folger's coffee at lower prices in the Cleveland-Pittsburgh area than in other geographic areas throughout the country. Plaintiffs allege no other anti-trust violation.

Folger answered the complaint by denying that it was guilty of any discriminatory pricing practices and asserted an affirmative defense under § 2(a) by claiming that even if it did discriminate, such discrimination was done in good faith to meet a competitor's, General Foods, price.

Presently before the court is defendants' motion for partial summary judgment relative to that portion of plaintiffs' complaint in which plaintiffs charge that the defendants violated § 2(a) and engaged in a discriminatory pricing practice through distribution of consumer coupons.[1] In support of the motion, defendants contend that consumer coupons are not an element of "price" within the meaning of § 2(a).

In order to assess defendants' contention, we must first consider the operation and effect of consumer coupons as well as that of trade coupons. A consumer coupon is the coupon one often sees in newspaper ads offering a certain number of "cents-off" the regular price of a particular grocery item. It is distributed by, and under the name of, the *manufacturer* of the advertised item. When the consumer clips the coupon and presents it at a retailer's checkout line, the consumer is given a commensurate reduction in the price of the item purchased. The retailer then returns the coupon to the manufacturer and is reimbursed for the reduction he has given the consumer.[2] It should be noted that it is the consumer who receives the reduced price and the manufacturer, not the retailer, who underwrites that reduction.

During much of the period in question, defendants distributed consumer coupons offering price reductions on Folger's coffee to Cleveland and Pittsburgh residents. That distribution was accomplished via direct mailings, newspaper advertisements, and inserts in the product package itself. Except for variations in their face value, all of defendants' coupons were subject to the same conditions of redemption. For purposes of this motion, the two most significant of those conditions were: (1) the coupons could be redeemed at any retail outlet in the country that stocked Folger's coffee, and (2) the retailer seeking reimbursement could be requested by Folger to prove that it had purchased amounts of coffee at least equal to the number of coupons redeemed.

The trade coupons, which defendants admit are an element of "price" within the meaning of § 2(a), worked somewhat differently. Folger would send a letter to its

---

1. Plaintiffs originally included all of defendants' consumer promotions in their § 2(a) claim. However, subsequently plaintiffs voluntarily dismissed the complaint as to the other promotional activities in so far as they were not delivered to consumers by, or redeemed through, retail grocery traders. The record indicates no such involvement by retailers in any of the so-called consumer promotions other than the consumer coupons. Hence, we treat this motion as involving only consumer coupons.

2. In addition to being reimbursed for the face value of the coupon, retailers in the instant case were given a 3-cent handling fee per coupon. Plaintiffs do not contend that this payment was in any sense a price concession.

retail traders announcing an offer whereby local retailers could publish coupons worth up to a certain number of "cents-off" under the *retailer's* own name, and Folger would redeem the coupons and reimburse the retailer for the price reduction given to the consumers. The key distinction between *trade* and *consumer* coupons is that the former was distributed under a particular retailer's name and, thus, was redeemable *only* at that place of business; whereas the latter was distributed by and under the name of the manufacturer and could be redeemed anywhere its product was sold. To the consumer, the trade coupon gave the appearance that a particular local trader was lowering his price when, in reality, it again was the manufacturer who absorbed the reduction, at least to the extent of the offer.[3] However, the actual processing of either coupon was the same. The consumer presented it to the retailer who then turned it over to Folger for redemption, again subject to the provision that Folger could require proof of retailer purchases at least equal to the number of coupons redeemed.

## II. LEGAL BACKGROUND

In its pertinent part, § 2(a) of Robinson-Patman states:

> "It shall be unlawful for any person engaged in commerce . . . either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be to substantially lessen competition . . . ."

The quoted language sets forth the essential elements of a § 2(a) prima facie case. The Act provides three affirmative defenses which a defendant may establish to rebut such a prima facie showing; namely, cost justification, good faith meeting of a competitor's price,[4] and changed circumstances.[5]

While there are various elements to a § 2(a) suit, the principal one is discrimination in price. 4 *Von Kalinowski*, "Antitrust Laws and Trade Regulation" ¶ 27.01. This, of course, is the issue underlying the dispute on the present motion. The defendants claim that consumer coupons are not "price," period; plaintiffs contend that they are.

Unfortunately, the Act contains no definition of the term "price," and the courts' efforts to define the term have proved to be as vexatious as any task encountered in the application of § 2(a). Nonetheless, it has been held that, generally speaking, "price" means the seller's invoice price minus any discounts, offsets, rebates, allowances, and the like, not reflected in the invoice. *Guyott Co. v. Texaco, Inc.*, 261 F.Supp. 942, 948 (D.Conn.1966); See also *Rose*, "Price Discrimination Under Robinson-Patman," 87 (1962); 4 *Von Kalinowski* ¶ 27.03[4]. Certain more specific criteria have been devised to aid in applying this general formula; namely, whether the "payment" is directly related to the quantity of goods purchased, *F.T.C. v. Fred Meyer*, 63 F.T.C. 1 (1963), aff'd, 359 F.2d 351 (9th Cir. 1966), or facilitates the original sale of the product to the retailer.[6] *F.T.C. v. New England Confectionary Company*, 46 F.T.C. 1041, (1949).

It is important to note that § 2(a) outlaws both direct and indirect price discrimination. Hence, in addition to the giving of quantity discounts, *Minneapolis-Honeywell Regulator Co. v. F.T.C.*, 191 F.2d 786 (7th Cir. 1951), cash discounts, *F.T.C. v. Borden Co.*, 54 F.T.C. 1225 (1959), and rebates, *Chicago Spring Products Co. v. United States Steel Corp.*, 254 F.Supp. 83 (N.D.Ill.1965), violations of § 2(a) have been found in less obvious devices such as the granting of free goods as a bonus for regular purchases,

---

3. Retailers were free to publish coupons offering price reductions beyond that offered to them by the manufacturer, but any such additional reduction was to be entirely absorbed by them (the retailers).

4. § 2(b) of the Act, 15 U.S.C. § 13(b).

5. § 2(a) of the Act, 15 U.S.C. § 13(a).

6. A payment which only facilitates the retailer's *resale* of the product to the consumer would normally be cognizable under a section of Robinson-Patman other than § 2(a), usually § 2(d) or 2(e).

*National Nut Company v. Kelling Nut Company*, 61 F.Supp. 76 (N.D.Ill.1945), freight allowances, *Guyott*, supra, special credit terms, *Skinner v. U.S. Steel Corp.*, 233 F.2d 762 (5th Cir. 1956), and preferential storage arrangements, *F.T.C. v. Firestone Tire & Rubber Co.*, 55 F.T.C. 1759 (1959).

■ Robinson-Patman, particularly § 2(a), is aimed at eliminating two types of competitive injury; namely, so-called primary line and secondary line injury.[7] Primary line injury refers to injury occurring at the seller level—the primary level—of competition. For example, assume that a national manufacturer and distributor of a product lowers its price to retail outlets in a particular city, but not throughout the rest of the nation. The result is that other *manufacturers*, those engaged at the primary level of competition, are likely to lose business in that isolated market, assuming, as is normally the case, that the retailer passes at least some of his savings along to the consumer.[8]

As the Supreme Court has noted, this sort of "geographic" price discrimination, which is the type of discrimination allegedly practiced by Folger here, was the impetus for Congress' original enactment of § 2(a). *F.T.C. v. Anheuser-Busch, Inc.*, 363 U.S. 536, 543, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960). It remains today probably the most commonly employed of the practices capable of producing primary line injury. 4 *Von Kalinowski*, ¶ 29.01[2]. The end result of this practice is normally that consumers receive a price reduction that is initiated and absorbed by the manufacturer, and the retailer acts as a middleman who merely passes on some or all of the manufacturer's reduction while retaining at least his regular profit margin.

Secondary line injury, which is not involved in this case, refers to injury at the customer level. This typically occurs when large chain stores use their vast purchasing power to obtain lower prices from manufacturers of the products they stock. Referring to the previous hypothetical, secondary line injury would result if the manufacturer sold its product at a lower price to "X" chain store than to the independent local distributor. Rather than switching *brands* as typically occurs in the primary line case, the consumer switches *stores*, thereby adversely affecting competition between the local chain store and the neighborhood distributor.

## III. DISCUSSION

### A. The Issue. Of "Price"

■ Turning now to the question before us, i. e., whether or not consumer coupons of the type described above are "price" within the meaning of § 2(a), we note at the outset a paucity of guiding precedent. The principal, indeed the only, authority materially relevant to the question is the *Fred Meyer* case, *supra*.

In *Fred Meyer*, respondent, Fred Meyer, Inc., (Fred Meyer) the owner of a chain of retail supermarkets in the Portland, Oregon area, instituted a promotion in which it published a coupon book offering a series of products at special values to those consumers who clipped the coupons and brought them to one of its many area stores. Manufacturers of the advertised products underwrote the promotion in various ways, the most relevant of which for our purposes was supplier Tri-Valley Packing Association's direct reimbursement to Fred Meyer of all savings passed on to the customer on the purchase of Tri-Valley peaches.[9]

---

**7.** Some cases do deal with injury at third and fourth levels of competition, see, for example, 4 *Von Kalinowski* ¶ 31.02–31.03, but most § 2(a) cases deal with primary and secondary line injury.

**8.** These are the basic facts of one of the best-known primary line cases, *F.T.C. v. Anheuser-Busch, Inc.*, 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960).

**9.** The Commission gave this more detailed description of the transaction:

During the 4-week period of this 1957 coupon book promotion, Portland consumers presented 20,750 of these "peaches" coupons at respondent's stores. In accordance with the terms stated on the face of the coupons, respondents "redeemed" those coupons by permitting each of the 20,750 consumer-bearers to purchase three cans of peaches (regu-

Because the promotional scheme was instigated by Fred Meyer, rather than a manufacturer as is normally the case, the Commission found Fred Meyer to be guilty of "knowingly inducing" a price discrimination in violation of § 2(f),[10] a charge which would initially require a finding that the induced payments were an element of "price" under § 2(a).

On appeal Fred Meyer argued as it did before the Commission that the payments from Tri-Valley, if anything, were cognizable under § 2(d) as compensation for services rendered by customers rather than § 2(a) price. The Ninth Circuit disagreed, stating rather succinctly that the Commission correctly decided that the payments were "outright price concessions" since they were directly related to the amount of goods purchased and resold. 359 F.2d 362.

From our analysis of *Fred Meyer* we are not satisfied that the workings of its coupon promotion are comparable in material respects to the consumer coupons at issue here.[11] In any event, however, *Fred Meyer* is not the law of this circuit, and we would respectfully decline to follow it even if it were more clearly in point. For in our judgment whatever may have been the fact in Fred Meyer, it is clear to us that Folger's consumer coupons reduced the price of coffee solely to the ultimate *consumer*, and not to Folger's customers, who under § 2(a) are the retailers, since those retailers received absolutely no price concession and served merely as redemption agents for Folger. There were simply no price reductions to retailers who might thereafter choose between increasing their own profit margin or voluntarily passing along the savings to consumers. On the contrary, the retailer received nothing from Folger until that retailer had first made a refund to a coupon-bearing consumer. The retailer's margin of

---

larly priced at 31-cents per can) for the regular retail price of two, i. e., the retail price of three cans of peaches was reduced by $33\frac{1}{3}$ percent (from 93-cents to 62-cents).

Stated another way, each of the 20,750 "redeemed" coupons represented a transaction in which a Portland consumer, in consideration for her purchase of two cans of peaches at the regular retail price of 31-cents per can, was given a third can free. Hence, the sum total of the "peaches" promotion was that respondents, in conjunction with the sale of 41,500 cans of peaches at the full retail price of 31-cents per can, gave away an additional 20,750 cans free of charge.

These 20,750 cans given away during the 4-week promotion period costs respondents nothing. They were simply replaced by the supplier. 63 F.T.C. 30–31.

10. The Commission summarized its reasoning as follows:

. . . [T]he . . . payment from Tri-Valley . . . was an outright price concession. Where money or something of value is given by a seller to a buyer without even the contemplation of promotional services by the purchaser, there has been no payment 'as compensation or in consideration' for such services and Section 2(d) is therefore not applicable (citation omitted).

Had the [payment from Tri-Valley] been an arbitrary sum bearing no relation to the volume of respondent's purchases, its inducement could have been treated as an unfair method of competition under Section 5 (citation omitted). But where, as here, the aggregate amount of the concession is directly related to the number of units purchased, its true character as a price concession is so clear that we are persuaded it should be treated in the manner prescribed by Congress in Section 2(a) and Section 2(f) of the amended Clayton Act, 63 F.T.C. 33.

11. Differences between the two may be noted. For example, Folger's consumer coupons were redeemable at any retail outlet nationwide, whereas Fred Meyer's coupons were redeemable only at its stores. Arguably, this is significant only in so far as it demonstrates that the threatened competitive injury was at the primary level in the former case as opposed to the secondary level in the latter case, a distinction which, as far as our research reveals, bears little, if any, relevance to whether the predicate act is cognizable under § 2(a). Also, differences concerning the source, timing, and manner of distribution appear to exist, but they may be more significant from a marketing standpoint than for Robinson-Patman purposes.

Conversely, we note that the effect of the consumer coupon and Fred Meyer promotions was substantially the same. In both situations the consumer obtained a reduction in the shelf price of a particular product by clipping a coupon and presenting it to a retailer who then turned it over to the manufacturer for reimbursement. The retailer in either case served merely as a middleman in what for him was a "wash" transaction, since it was the manufacturer who underwrote the price reduction.

profit remained the same regardless of whether the featured product was purchased with or without a coupon. Thus, the consumer coupon promotion was a transaction between Folger and the consuming public, not Folger and its retail customers.

A hypothetical might serve further to illustrate our point. Suppose that instead of requiring consumers to redeem their coupons at the grocery check-out line, they were directed to redeem them at a local bank. We doubt that one would argue that the manufacturer's purchaser, the retailer, who played no part at all in the transaction, could be said to have received a discriminatory price reduction, and yet this hypothetical differs from the consumer coupon promotion only in that in the latter case the cash discount is collected by the consumer from a grocery cashier rather than from a bank teller. In fact, this imagined promotion is not materially different from Folger's own consumer refund campaign which, as we noted earlier,[12] plaintiffs admit is not cognizable under § 2(a). In that program, Folger distributed coupons through local newspapers. Consumers then returned the coupons along with proof of purchase of Folger's coffee to Folger, which thereafter refunded directly to the consumer a cash payment equal to the face amount of the coupon.

Notwithstanding the foregoing, our conclusion that consumer coupons are not cognizable under § 2(a) is not arrived at without some difficulty. The argument certainly can be made that promotions such as Folger's consumer coupon campaign have at least as great an anti-competitive impact as some of those which are clearly prohibited under § 2(a) and, therefore, that the former should as well be found in violation.[13] The answer to that, however, as we view it, is that Robinson-Patman does not simply prohibit an undesirable *end result* (the substantial lessening of competition), but rather prohibits certain *conduct* where the effect thereof may be to bring about that undesirable end result. Specifically, § 2(a) does not seek to eliminate competitive injury generally, but only that competitive injury which is caused by a supplier granting a *discriminatory price* advantage to his *customer*. In this case, while competitive injury may have resulted from Folger's consumer coupon campaign, the geographical price reductions offered by Folger were not to its *purchasers* or customers—the retail grocery outlets—as proscribed by § 2(a), but directly to the ultimate *consumer*, the "buying public," which concededly (see fn. 1) is not Folger's "purchaser" under § 2(a), and, conduct therefore, not proscribed by § 2(a).

Accordingly, the motion for summary judgment on that portion of plaintiffs' complaint based on defendants distribution of consumer coupons will be granted.[14]

---

12. See fn. 1, *supra.*

13. Assuming that neither primary nor secondary line competitive injury occurs unless the ultimate consumer decides to switch brands, in the primary line case, or stores, in the second line case, it seems clear that competitive injury is more likely to occur if price reductions are made available directly to the *consumer*, as is the case with consumer coupons. Folger's consumer coupon program virtually guaranteed that certain consumers would receive a price reduction; whereas with an out-right, unconditional reduction in price by Folger to its *retailers*, there would be no guarantee that the acquisition price reduction would be passed along to the consumer. Yet we believe, and are so ruling, that the latter if done on a geographically discriminatory basis constitutes a violation of § 2(a), while the former, at least as exemplified in this case, does not.

14. Subsequent to the drafting, but prior to the filing, of the Opinion herein, we granted motions for summary judgment and to dismiss wherein we removed Penn-Western Food Corp. as a party plaintiff and The Procter & Gamble Company as a party defendant in this action. Those rulings do not in any way affect the issues discussed and ruled on herein.