EXIMCO, INC., John D. Spears, Joseph D. Michelli and Rufus I. Davis, Plaintiffs-Appellants,

v.

The TRANE COMPANY and Shepherd Sales & Service, Inc., Defendants-Appellees.

No. 82–3591.

United States Court of Appeals, Fifth Circuit.

July 30, 1984.

Tate, Circuit Judge, concurred in part, dissented in part, and filed opinion.

MacAllynn J. Achee, Baton Rouge, La., for plaintiffs-appellants.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Howard E. Sinor, Jr., David G. Radlauer, Charles W. Lane, III, New Orleans, La., for Trane Co.

Stone, Pigman, Walther, Whittmann & Hutchinson, Phillip A. Wittmann, James C. Gulotta, Jr., New Orleans, La., for Shepherd.

Before TATE, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This heated controversy arises from an agreement made by the Trane Company ("Trane") of Wisconsin granting Eximco, Inc. ("Eximco") of Arkansas, a non-exclusive right to market lightweight air conditioning products in Louisiana and south Mississippi. For at least eighteen years Trane and Shepherd Sales & Service, Inc. and George W. Shepherd, Inc. (collectively "Shepherd") had a parts outlet and exclusive franchise relationship in that same area. Trane and Eximco effectively terminated their agreement approximately four months after entering into it when Trane reduced Eximco's credit line. Eximco filed this lawsuit in response, alleging that Trane breached their agreement, violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, section 7 of the Clayton Act, 15 U.S.C. § 18, section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13, and committed wrongful acts against the individual principals of Eximco, damaging their reputations and causing them mental anguish as well as economic harm. Eximco also named Shepherd as a defendant, alleging that Shepherd tortiously interfered with its Trane contract. Trane filed a counterclaim, seeking to recover on a note made by Eximco and personally guaranteed by one of the Eximco principals.

The district court granted summary judgment for Trane on most of the individual principals' claims and for Shepherd on the tortious interference with contract claim. At the close of trial, the court granted directed verdicts in favor of Trane on the remaining individual claims and on the antitrust claims. The jury returned a $900,000 general verdict in favor of Eximco

on the breach of contract claim, and awarded Trane $140,000, the face value of the note, on its counterclaim. On Trane's motion, however, the district court ordered a new trial on the breach of contract issue, because it felt that the multiple issues presented to the jury and the general verdict form it used had caused prejudice and confusion, and because no evidence supported the $900,000 damage award. The jury at the second trial found no breach of contract by Trane.

Eximco appeals, arguing that the district court improperly issued summary judgments and directed verdicts on the individual claims and tortious interference with contract claim, improperly issued a directed verdict on the antitrust claims, and abused its discretion by ordering a new trial on the breach of contract claim. Eximco also raises several issues relating to the second trial.

We affirm the district court's summary judgments and directed verdicts. We reverse its decision to order a new trial, however, and because we do so, do not reach the issues relating to the second trial.

## I.

### A.

Trane manufactures and sells air conditioning equipment and related products throughout the nation, through a system of franchisees, stocking wholesalers, and parts outlets. Its products vary from light residential units of one-and-one-half tons to heavy commercial units of four thousand tons.

Franchisees and their salesmen have the exclusive right to act as Trane's sales agents in a designated geographic area. The franchisee's salesmen solicit orders from customers, or "accounts" on behalf of Trane. The customers, however, receive their equipment directly from Trane; the franchisee does not take title to, or physical possession of, the equipment it sells on Trane's behalf. According to the agreement, the franchisee and its salesman receive a commission on each piece of Trane equipment sold in their territory irrespective of the origin of the sale.

In 1975, disappointed with its sales in the residential and light commercial air conditioning equipment market, Trane began creating a network of stocking wholesalers to penetrate that market. Stocking wholesalers purchase residential and light commercial equipment from Trane as inventory, and then resell it to their own customers, usually dealers or general contractors. Stocking wholesalers, unlike franchisees, do not have exclusive rights or specifically allocated territories. If the stocking wholesaler operates in an area covered by a franchise, the franchisee's salesman in that area receives a commission on all the stocking wholesaler's sales within his territory.

Trane also has qualified parts outlets that purchase and resell replacement parts for Trane equipment. Franchise holders and stocking wholesalers also may qualify to become parts outlets.

### B.

Shepherd had been a Trane franchisee in south Louisiana for at least eighteen years when this controversy arose. Another franchisee located in Little Rock had the right to sell Trane products in Arkansas. Trane also had an established relationship in El Dorado, Arkansas, with South Arkansas Supply Company ("South Arkansas"), a stocking wholesaler and qualified parts outlet.

The principal of South Arkansas, Tom Calhoun, was a friend of John Spears, one of the principals of Eximco. Early in 1978 Spears contacted Calhoun, expressing an interest in expanding South Arkansas' business into the Little Rock area. He also had been talking with two other friends, Joe Michelli and Ike Davis, both of whom had considerable experience selling air conditioning products in Louisiana, about the possibility of the three of them operating an air conditioning business out of Baton Rouge, Louisiana. With these two ideas in mind, in January of 1978, Calhoun and

Spears attended an air conditioning trade show in Atlanta.

At the trade show, Spears and Calhoun met with Stu Svoboda, a Trane representative, and discussed business possibilities in Arkansas and in Louisiana. Svoboda was not encouraging about expanding into the Little Rock area. Trane was eager to penetrate the Louisiana market with its residential and light commercial line, however, and agreed with South Arkansas and Eximco (collectively "Eximco"), as joint venturers, to create a stocking wholesaler in Baton Rouge. He indicated that Trane would extend South Arkansas's credit line temporarily to set up the Louisiana venture, and that Eximco and Trane could agree to definite credit terms later. He gave them a map of the contemplated territory in Louisiana, and discussed with them the terms of the Trane "ABC Supply letter" under which Calhoun operated South Arkansas. The letter is a form letter which explains how Trane intends the stocking wholesaler to operate.

According to the terms of the ABC Supply letter, the stocking wholesaler is to purchase two- to fifteen-ton Trane equipment as inventory and resell it. According to the letter, Trane expects payment for inventory shipped at the end of each month. The letter also explains in detail the share of advertising costs Trane will bear, and promises Trane's "sales office" will train the stocking wholesaler's salesmen. Finally, the letter promises direct sales assistance from "highly trained sales engineers working the same territories" as the distributor wholesaler.

From the outset Trane and Eximco knew that the Louisiana stocking wholesaler operation would be unlike any other because Eximco planned to sell Trane brand products only. At the initial meeting in Atlanta, however, Svoboda did not explain Shepherd's relationship to Eximco, or even mention that Shepherd existed.

After meeting with Spears and Calhoun in Atlanta, Svoboda called Trane in Wisconsin with the news that "we have got Baton Rouge." Spears called Davis and Michelli who, shortly thereafter, resigned their jobs with other air conditioning firms, and rented office and warehouse space for their new business as a stocking wholesaler of Trane products. Although the parties contemplated future meetings, especially to discuss credit terms, in February Eximco opened its doors and began selling Trane air conditioners. South Arkansas supplied Eximco with the inventory that allowed it to open so soon after it struck an agreement with Trane.

In March, through South Arkansas, Eximco placed its first order for inventory directly from Trane. Then, in April, Spears and Calhoun went to the Trane offices in LaCrosse, Wisconsin, and obtained a commitment for a $400,000 joint line of credit for Eximco and South Arkansas. The credit agreement allowed Eximco one hundred and twenty days to pay for inventory shipped. In exchange for these favorable terms, Spears and Calhoun personally guaranteed the debts of the companies and gave Trane a purchase money security interest in its inventory. Eximco and South Arkansas indicated that they planned to obtain additional, outside financing for Eximco.

Eximco and Trane never executed a written contract. When Eximco inquired about the necessity of a written agreement, Trane responded that their relationship would be governed by the terms of the ABC Supply letter. Calhoun and Arkansas Supply similarly did not have a written contract, Trane having told Calhoun that such a contract would violate its agreement with its franchisee in Arkansas.

After the Atlanta meeting in January, however, Eximco apparently did not fully understand the Trane marketing system. The new venture experienced problems almost immediately, when, in February, one of Shepherd's salesmen introduced himself to Eximco. At a subsequent meeting a few days later between Shepherd, Spears, Davis, and Michelli, George Shepherd explained that Eximco's dealership could not be exclusive, even in the light commercial and residential equipment market, and ex-

plained that Eximco could not expect to compete profitably with his salesmen on some jobs. On these jobs Eximco would have to charge its cost plus a mark-up, while Shepherd's salesmen would be selling directly on behalf of Trane. Shepherd suggested that Eximco sell primarily to dealers of residential units. At this time Eximco disregarded Shepherd's suggestion because it did not think Eximco was "working for Mr. Shepherd."

On at least two subsequent occasions, and during the time Eximco was finalizing its credit terms with Trane, Eximco lost sales to Shepherd's salesmen because their price to ultimate consumers was at or below Eximco's cost.[1] Then, in May, Shepherd caused Eximco other problems when some of Shepherd's salesmen gave Eximco a list of accounts in the Baton Rouge area with instructions not to call on them. When Eximco eventually indicated its willingness to cooperate with Shepherd and to concentrate on the two- to five-ton residential market, however, it evidently had some difficulty returning its heavier inventory to Trane for credit.

Eximco also experienced problems in dealing directly with Trane, including inability to become a qualified parts outlet in Louisiana, and inability to obtain necessary information from Trane pertaining to the warranty coverage of equipment it sold. According to Eximco, this lack of information frustrated its ability to provide warranty services to its customers. Trane told Eximco that providing the warranty information would require duplicating warranty cards, and would be prohibitively costly. Finally, and not insignificantly, Shepherd and Trane's franchisee in Arkansas could not agree on whose salesmen would receive the commission on some of Eximco's sales. Eximco procured at least some of its inventory through its Arkansas co-venturer, but it sold most of its inventory in Louisiana. Thus, both Shepherd's salesmen and the Arkansas franchisee's salesmen expected a commission. Eximco was caught in the middle of a controversy, and risked exacerbating the difficulties of its already strained relationship with Shepherd in Louisiana.

In response to Eximco's requests for assistance with all these problems, in May of 1978 Trane sent Svoboda to Louisiana to attempt to resolve the "communication problems" with the Baton Rouge operation. After a meeting among Shepherd, Shepherd's salesman in the Baton Rouge Area, Svoboda, Spears, Davis and Michelli, Svoboda told Eximco that "there was nothing he could do" for Eximco.

By mid-June of 1978 Eximco and South Arkansas had approached or exceeded their $400,000 joint credit line. Trane sent Eximco a letter requesting information of costs and profits and requesting verification that Eximco had filed instruments perfecting Trane's security interest in Eximco's inventory. Before Trane received any response to this letter, however, it received an order from Eximco for approximately $100,000 worth of additional equipment. Trane's regional credit manager telephoned Eximco to say that Trane would release no more equipment unless Eximco reduced some of its outstanding debt to Trane.[2] Eximco sent Trane two checks, totalling about $100,000. The checks, however, were post-dated by two to three weeks because, according to Spears, one hundred and twenty days, Eximco's credit term, had not elapsed from the time Eximco placed

---

1. The sales Eximco lost were to chain food outlets, both of which used relatively light commercial capacity equipment. As the district court found, "In each case, the price quoted by Trane, through Shepherd, was less than the price Eximco could quote, and in fact, the actual cost of the product to Eximco was more than the bid submitted by Trane."

2. Whether Eximco actually exceeded its credit limit is disputed. Eximco denies that it did so,

but may not have understood, or may not have been advised, that Trane reduced its credit line upon receipt of an order, rather than when Trane shipped the equipment to Eximco. Additionally, Trane was receiving orders on the joint credit line from at least two locations, Eximco in Baton Rouge and South Arkansas in El Dorado. Spears and Calhoun apparently did not keep each other advised of equipment orders.

its first order. Trane deposited the checks, but the bank returned them because they were post-dated. When Trane called Eximco about the checks, Eximco instructed Trane to redeposit them, assuring Trane the checks would be honored.

In response to the situation developing in Louisiana and Arkansas, in mid-July Trane sent its national credit manager to Louisiana to visit Eximco. A previous intercompany memorandum written by the credit manager expressed concern over the "asset rich" but "cash poor," Eximco account, even though the account, according to the credit manager, appeared to be making money for Trane. The credit manager testified that when he went to Baton Rouge, reducing the $400,000 credit line was foremost in his mind. The credit manager met with Spears on July 17 to discuss Eximco's financial condition. Eximco still had not provided audited financial statements or a written operating plan, both of which Trane had requested. Eximco also had not obtained additional bank financing as discussed at the March meeting in Wisconsin.

The credit manager indicated to Eximco that Trane was reducing Eximco and South Arkansas's joint line of credit to $100,000, the amount of South Arkansas's credit line prior to the Louisiana venture. Spears replied that such action would put Eximco out of business; the credit manager responded, "I know that." In response to Trane's action which it considered grossly unfair, on July 20, Eximco issued a stop-payment order on the post-dated checks. These events—the credit line reduction and the stop-payment order—effectively ended the business relationship between Eximco and Trane.

In early August of 1978 Spears and Michelli travelled to Trane's Wisconsin office to attempt to work out a solution to their problems. Trane offered to reimburse Eximco's initial investment in Eximco, but Spears and Michelli declined. Eximco returned its inventory and assigned some of its accounts receivable to Trane to reduce its debt. Spears personally guaranteed a

note from Eximco to Trane in the amount of $140,000 for the rest.[3]

The testimony at trial indicates that Eximco was unprofitable during its first month of operation, but that sales "picked up daily" during its four months of operation. Although most of Eximco's business records were destroyed accidentally sometime between 1978 and the time of trial, Davis, one of Eximco's principals, remembered that Eximco sold about $289,000 worth of equipment during its four months of operation.

## II.

We can dispense with many of Eximco's claims quickly. At oral argument Eximco conceded its antitrust claims, except for the alleged violation of the Robinson-Patman Act. Additionally, although the Louisiana Supreme Court several times has suggested that it presently may recognize a cause of action for tortious interference with contract, it thus far explicitly has declined to do so. *PPG Industries, Inc. v. Bean Dredging*, 447 So.2d 1058, 1059 n. 1 (La.1984); *Sanborn v. Oceanic Contractors, Inc.*, 448 So.2d 91, 95 n. 5 (La.1984) (citing cases). Consequently, we affirm the district court's granting of summary judgment on the tortious interference with contract claim. *Taylor v. Jim Walter Corp.*, 731 F.2d 266 (5th Cir.1984). Finally, we agree with the district court that the principals of Eximco failed to prove any injury suffered by them personally, separate from the injuries suffered by Eximco, Inc. As we said in *United States v. Palmer*, 578 F.2d 144, 145–46 (5th Cir.1978), "The law is clear that only a corporation and not a shareholder, not even a sole shareholder, can complain of any injury sustained by, or a wrong done to, the corporation." *See also Mente & Company v. Louisiana State Rice Milling Co.*, 176 La. 476, 146 So. 28 (1933). We therefore affirm the district court's granting of summary judgment on Eximco's principals' individual claims.

---

**3.** Calhoun did not personally guarantee any of    the Eximco debt.

With these issues decided, we turn now to the more troublesome ones, beginning with the question whether the district court properly granted Trane's motion for a new trial on Eximco's breach of contract claim and then discussing whether Trane violated section 2(a) of the Robinson-Patman Act.

### A.

■ A district court may order a new trial if, after weighing the evidence for itself, it believes the jury's verdict is contrary to the clear weight of the evidence. *United States v. An Article of Drug Consisting of 4,680 Pails*, 725 F.2d 976, 989–90 (5th Cir.1984); *Robin v. Wilson Brothers Drilling*, 719 F.2d 96, 98 (5th Cir.1983); *Bazile v. Bisso Marine Co.*, 606 F.2d 101, 105 (5th Cir.1979), *cert. denied*, 449 U.S. 829, 101 S.Ct. 94, 66 L.Ed.2d 33 (1980). A trial judge also may order a new trial if some event at trial irreparably prejudiced the jury's verdict. *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 781 (5th Cir. 1983) (inflammatory closing argument); *Carson v. Polley*, 689 F.2d 562, 569–70 (5th Cir.1982) (evidence ruled inadmissible inadvertently sent to jury room); *Meyers v. Moody*, 693 F.2d 1196, 1220 (5th Cir.1982) (prejudicial comments during closing argument).

■ On appeal we review a district court's decision granting or denying a new trial under an abuse of discretion standard. *E.g., An Article of Drugs*, 725 F.2d at 990; *Bazile*, 606 F.2d at 105. When the district court denies a new trial, it ratifies the jury's assessment of the case and great deference is appropriate under those circumstances. When the district court grants a new trial, however, our inquiry generally is broader, even though the standard remains one of abuse of discretion. *Carson v. Polley*, 689 F.2d at 570 (5th Cir.1982); *Reeves v. General Foods Corp.*, 682 F.2d 515, 519 n. 6 (5th Cir.1982). The difference in our inquiry stems from our respect for the jury as an institution and from our concern that the party who initially persuaded the jury should not be stripped unfairly of a favorable decision. *Carson v. Polley*, 689 F.2d at 570.

In this case the district court gave three specific reasons for granting Trane a new trial: that no evidence had been adduced sufficient to support a damage award of $900,000, that Trane was prejudiced in trial of the contract claim because the jury heard evidence on Eximco's antitrust claims and on the individual principals' personal claims, and that the general verdict form allowed the jury to substitute emotion and prejudice for specific fact finding. Our own review of the trial record in the light of these statements indicates that the district court abused its discretion by granting a new trial for these reasons.

■ Trane argues that no contract existed between itself and Eximco, or, in the alternative, that it did not breach any contract that a jury might have found existed. Our own review of the record leads us to disagree with Trane's contention. Both the jury in the first trial and the jury in the second trial found that Trane had a stocking wholesaler agreement with Eximco, the terms of which could have been discerned from the ABC supply letter, as modified by the parties' subsequent agreement or conduct. Eximco adduced enough evidence for a jury to conclude further, as the first jury evidently did, that Trane breached this agreement, either by rescinding the $400,-000 credit line prematurely or without just cause, or by failing to carry out the terms of its agreement with good faith. A jury also could have concluded that Trane's unhelpful posture toward Eximco during its difficulties with Shepherd did not fulfill the promise of direct sales assistance from Trane sales engineers contained in the ABC supply letter. Because the court submitted the breach of contract issue to the jury in general verdict form, we do not know the basis for the jury's conclusion, but hold that the jury could have found on any one or more of the several bases that Trane failed to fulfill its contractual obligation to Eximco.

We agree with the district court, however, that Eximco did not present evidence

sufficient to support a damage award of $900,000. Eximco introduced evidence of the three principals' initial investment, Eximco's start-up expenses of approximately $11,000, and testimony by Davis that he "seemed to remember" a $289,000 gross sales figure for the four months Eximco was in operation. Eximco also introduced evidence that its three principals had been successful in the air conditioning business in Louisiana before their Trane venture, testimony of Svoboda that the joint venturers anticipated they could sell a million dollars worth of equipment over an unspecified time, and imprecise testimony by Spears that sales were "picking up daily." In addition to lacking supported net or gross sales figures, the record contains little evidence of operating costs, no evidence of cost of goods sold, and little evidence pertaining to average profit margin—either Eximco's or the industry's. The record also does not contain any growth or expansion plan or any factually or statistically supported profit or loss projections. The district court did not abuse its discretion in deciding that the jury could not have derived a $900,000 damage figure from the evidence adduced.

■ The district court, however, did not hold or decide that the jury's finding of substantive liability on the breach of contract issue is not supported by the weight of the evidence, and our review of the record indicates that adequate evidence supports the jury's finding of liability for breach of contract. The law is settled that an error at trial relating to one issue that does not affect the determination of other issues does not justify granting a new trial on any issue except the tainted one. *Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530 (5th Cir.1984). *See generally* 11 Wright & Miller, *Federal Practice and Procedure* § 2814 (1977). This court allows a new trial only on the issue of damages. "[W]here, as here, the jury's findings on questions relating to liability were based on sufficient evidence and made in accordance with law, it [is] proper to order a new trial only as to damages."

*Hadra v. Herman Blum Consulting Engineers*, 632 F.2d 1242, 1246 (5th Cir.1980), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1983, 68 L.Ed.2d 301 (1981). *See also Maxey v. Freightliner Corp.*, 727 F.2d 350 (5th Cir. 1984). *But see Nissho-Iwai*, 729 F.2d at 1538. We therefore uphold the district court's decision to grant a new trial on the issue of damages, but hold that insufficient evidence on the damage issue alone will not support the district court's decision to grant a new trial on the liability issue.

■ The district court gave two reasons for granting Trane a new trial. It said that the jury may have been prejudiced by having heard evidence on the antitrust and individual claims, and that the general verdict form submitted to the jury allowed it to substitute emotion for fact finding. Neither of these reasons justifies denying Eximco its jury verdict on the issue of liability.

The district court decided the antitrust and individual claims on Trane's motion for directed verdict at the close of Eximco's presentation of all the evidence. Until that point, both the antitrust and individual claims were in issue before the jury. Most of the evidence was relevant to the claim for breach of contract as well as to the issues decided on motions for directed verdict, and the district court admitted much of it over Trane's objection to its relevancy and prejudicial effect. After granting Trane directed verdicts, the court explained to the jury that the antitrust and individual claims were no longer in the case, and that the only questions left for the jury were whether Trane had a contract with Eximco that it breached, and whether Trane should recover on the Eximco note personally guaranteed by Spears. These two remaining issues are simple, and the district court properly instructed the jury on contract law and on the law relevant to Trane's counterclaim. In the light of the full explanation given to the jury, the jury instructions, and the fact that almost all the evidence adduced at trial related to the con-

tract claim as well as to the claims for which the court issued a directed verdict,[4] the court should not have ordered a new trial because of possible prejudice or confusion by the multiplicity of issues upon which the jury heard evidence.

Finally, the district court's use of a general verdict form that it said allowed the jury to substitute emotion for specific fact finding cannot be a basis for ordering a new trial in this case. After the district court properly instructed the jury, Trane specifically asked for special interrogatories, especially on the issue of damages, expressing concern that the jury might return a verdict not supported by the evidence. The court refused, stating that the amount the jury awarded as damages would indicate whether the award was supported by evidence in the record. The district court made a conscious decision to use the general verdict form, even after having had the potential for jury confusion or emotive response specifically called to its attention. The jury had been properly instructed concerning the only remaining issues of liability. The district court thus should not deny Eximco's favorable jury verdict on the issue of liability because of the district court's own choice of verdict form.

We uphold the district court's decision to grant a new trial on the issue of damages, but reverse its decision to grant a new trial on Trane's substantive liability on Eximco's claim for breach of contract, and now turn our attention to section 2(a) of the Robinson-Patman Act.

### B.

Section 2 of the Robinson-Patman Act provides that "[i]t shall be unlawful for any person engaged in commerce ... to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be ... to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them ...." 15 U.S.C. § 13(a). We begin our analysis by noting that, if interpreted literally, section 2(a) applies to Trane's conduct.[5] Trane, engaged in commerce, sold to "different purchasers" like commodities at different prices, and thereby injured Eximco's ability to compete with Trane, a "person" who granted the benefit of such discrimination. Because, however, section 2(a) is a statement of economic policy and has been illuminated by almost half a century of interpretory case law, economic analysis, and commentary, we cannot end our inquiry with this simple litmus-test application of the statutory language. We must examine section 2(a) in the light of sound economic theory, and attempt to effectuate as much as possible the somewhat paradoxical intent behind the Robinson-Patman Act,

---

**4.** Among Eximco's theories at trial was that Trane either conspired with its franchisee in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, or breached its Eximco contract through the acts of its agent, Shepherd, or through implicit ratification of Shepherd's frustrating conduct. Without deciding whether Shepherd was either Trane's general agent, or Trane's agent for purposes of doing business with Eximco, we note that the allegedly prejudicial evidence still was relevant on the issue of whether Trane breached its good faith obligation to perform its contract with Eximco. *See National Safe Corp. v. Benedict and Myrick, Inc.,* 371 So.2d 792 (La.1979); *Smith v. McCarty,* 414 So.2d 400 (La.App.1982). *See also Newark Motor Inn Corp. v. Holiday Inns, Inc.,* 472 F.Supp. 1143, 1151 (D.N.J.1979).

*Most of the evidence relating to the individuals' claims relates to the issue of damages, showing the principals' initial investment and their subsequent losses. This evidence also was relevant to the issue of damages suffered by Eximco. To the extent that some of the evidence was prejudicial—specifically, testimony by Spears that he lost his home and had a negative net worth, and that his wife came to trial in a borrowed dress—it was mitigated by the fact that the trial continued for several days, and the jury heard testimony from many witnesses. In the light of the quantity of evidence the jury heard, the relatively few objectionable statements made by Spears do not justify granting a new trial.*

**5.** *See supra* note 1 and accompanying text.

which is to promote competition by protecting competitors.[6]

■ Injury under section 2(a) of the Robinson-Patman Act will be one of two basic types: primary line or secondary line.[7] Primary-line injury, which occurs at the level of direct competition, customarily results when a seller uses predatory pricing policies to enhance his market position over competitors, thereby diminishing the vigor of competition and increasing market concentration. Secondary-line injury customarily results when a large purchaser uses its vast purchasing power to obtain low prices from the manufacturers or distributors whose products it stocks, thereby enabling it to undersell competitors. Secondary-line cases are typical "favored purchaser" cases. *See Foremost Dairies, Inc. v. F.T.C.*, 348 F.2d 674, 678–79 (5th Cir. 1965); *Indian Coffee Corp. v. Procter & Gamble Co.*, 482 F.Supp. 1104, 1108 (W.D. Pa.1980) (explanation and examples of types of injury). *See generally* Hansen, *Robinson-Patman Law: A Review and Analysis*, 52 Fordham L.Rev. 1113, 1134–1142 (1983).

■ Eximco alleges that it suffered secondary-line injury. A plaintiff alleging secondary-line injury must prove that a seller made a sale to two different buyers at the same functional level of competition, charging different prices to each. *L & L Oil Co. v. Murphy Oil Corp.*, 674 F.2d 1113, 1120 (5th Cir.1982); *M.C. Manufacturing Co. v. Texas Foundries, Inc.*, 517 F.2d 1059, 1066 (5th Cir.1975); *Stough v. May and Co. of Georgia*, 484 F.2d 22 (5th Cir.1973). *See generally* L. Sullivan, *Antitrust* § 218 (1977). Eximco argues that Shepherd is the equivalent of a purchaser competing at the same functional level of competition with Eximco, notwithstanding the fact that Shepherd did not actually take title to any of the merchandise it sold on behalf of Trane. Eximco argues that to deny relief under section 2(a) on the basis that a "purchase" in the property law sense has not

---

**6.** Congressional concern with protecting competition is apparent from the language of the statute, which says in full:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such .commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and *where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person* who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . .

15 U.S.C. § 13(a) (emphasis added). *See also International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 721 (5th Cir.1975); *Borden Co. v. FTC*, 381 F.2d 175, 180 (5th Cir. 1967); *Purex Corp.*, 51 F.T.C. 100, 108–17 (1954).

A review of the congressional debates leading up to the passage of the Robinson-Patman Act, however, leaves little doubt that the primary motivation of those supporting the Act was protection of small competitors who did not have the leverage with suppliers that larger competitors enjoyed. As expressed by Representative Patman:

> [T]here has grown up in this country a policy in business that a few rich, powerful organizations by reason of their size and their ability to coerce and intimidate manufacturers have forced those manufacturers to give them their goods at a lower price than they give to the independent merchants under the same and similar circumstance and for the same quantities of goods. Is that right or wrong? It is wrong.

80 Cong.Rec. 8118 (1936). The particular threat the Act sought to eliminate was from chain stores. *See generally* Hansen, *Robinson-Patman Law: A Review and Analysis*, 52 Fordham L.Rev. 1113, 1120–24 & accompanying notes (1983). Congressional sentiment against chain stores was simply a reflection of a larger national sentiment prevalent at that time. Particularly interesting in this Louisiana case, is Huey Long's proclamation that he "would rather have thieves and gangsters than chain stores in Louisiana." Fulda, *Food Distribution in the United States, the Struggle Between Independents and Chains*, 99 U.Pa.L.Rev. 1051, 1051 (1951).

**7.** Some cases recognize third or fourth levels of injury, in which the plaintiff competes with the purchaser's customer or that customer's customer. *See* Von Kalinowski, *Antitrust Laws and Trade Regulation* ¶ 31.02–31.03. These cases, however, are extensions of secondary-line analysis.

occurred, as Trane would have us do and as the district court did, would be to exalt form over substance and allow manufacturers to avoid their legal obligations through use of creative and strategic distribution schemes.

■ Although Eximco's arguments are logical enough, at least at first blush, they are foreclosed by this court's holding in *Security Tire & Rubber Co. v. Gates Rubber Co.*, 598 F.2d 962 (5th Cir.1979) *cert. denied*, 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309. In the *Security Tire* case we held that a transfer of inventory from a manufacturer to a wholly owned subsidiary corporation was not a "purchase" for purposes of section 2(a). *Id.* at 965. The analysis of that case, however, rests not on the technical requirements of property law, but on antitrust policy considerations and economic analysis.

The court in *Security Tire* specifically rejected legal authority holding that a manufacturer's company-owned outlet competed in an antitrust sense with other outlets who purchased the manufacturer's products for resale. *See id.* at 965–66 and n. 1. In rejecting this authority, the court looked behind distribution structure to ascertain the identity of the true competitors. "Realistically," the court determined, "the competition here was between [the manufacturer and its subsidiary outlet] as a single economic unit, on the one hand, and Plaintiffs, on the other hand." *Id.* at 967. "Internal transfers" between the two levels in the distribution chain, were "of no real competitive consequence" to the alleged

disfavored buyer. Thus, the price differential was not the kind of economic injury protected by the antitrust laws, because the transfer between a corporation and its subsidiary could not be considered a favored sale. *Id.* *Accord Brown v. Hansen Publications, Inc.*, 556 F.2d 969 (9th Cir. 1977); *Uniroyal, Inc. v. Hoff and Thames, Inc.*, 511 F.Supp. 1060, 1067 (S.D.Miss. 1981). *See also* ABA Antitrust Section, Monograph No. 4, *The Robinson-Patman Act: Policy and Law*, Vol. 1, 48–50 (1980).

Because this case similarly involves no favored sale, Shepherd is to Trane what the subsidiary corporation outlet was to the manufacturer in *Security Tire*. Shepherd did not "purchase" inventory from Trane in the antitrust sense, not simply because it did not take title to the merchandise, but because intra-enterprise transfers are not favored sales. In fact, this case, in which the alleged competitor is a sales agent rather than a wholly owned subsidiary corporation, presents a more compelling fact situation for holding the two enterprises to be one entity than did the facts in *Security Tire*.[8]

In *Security Tire*, the ultimate customer's contact was only with the subsidiary corporation; he may not have known of the parent corporation's existence or identity. In contrast, Shepherd's customers had a direct relationship with both Shepherd and Trane. Although Shepherd made the initial contacts with the customer leading to the sale of equipment, Trane shipped the equipment directly to, and passed title directly to, the customer.[9] The customers of Trane

---

**8.** The dissent distinguishes *Security Tire* on the basis that an entity comprised of a parent and subsidiary does not have the same motive to harm an independent outlet as does an agent, because the subsidiary's interest is identical to the parent's. This distinction, however, does not reflect market reality. A subsidiary and an agent each have an incentive for economic success, even if success is at the expense of an independent outlet selling on behalf of a parent or principal. That an agent or its salesmen operates on a commission basis, as did Shepherd's salesmen in this case, is irrelevant. A subsidiary's salesmen and management also may operate on a commission or bonus basis, but even if they do not, the subsidiary still has

the incentive to remain in business. In any event, to focus on the motive of the subsidiary to determine the likelihood of a Robinson-Patman violation is misguided. The relevant object of inquiry is the behavior and incentive of the parent.

**9.** We do not mean to imply that the passage of title from Trane to the customer is significant for purposes of determining the presence of a sale to different purchasers at the same level of competition. That title passed directly from Trane is significant only because it indicates concerted operation by Trane and Shepherd in each sale, and indicates that the customers

and Shepherd knew they purchased equipment from a single entity comprised of a large supplier and a local agent. This fact further indicates that Eximco's real competitor, against whom it was vying for sales of Trane air conditioners, was the single economic entity comprised of Trane and Shepherd. Thus, because Trane did not make a sale to two buyers at the same level of competition, Shepherd could not have suffered secondary-line injury.

This case similarly does not fit the primary-line model of analysis. Primary-line injury usually occurs when a competitor in one geographic or product market uses profits from another geographic or product market in which he also competes to subsidize his predatory prices in the first market. By absorbing his losses over a short term in that first market and underselling his competitors, he hopes eventually to drive them out of business and achieve market power that will enable him to charge monopolistic prices and more than recoup his short term losses. In *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976), this court adopted a price-based test for determining the presence of primary-line injury, rejecting analyses that focused on the defendant's objective or subjective intent, or merely upon diversion of sales. *Id.* at 721–23. The test adopted in *International Air Industries* is an average-unit-cost test,[10] based on the reasoning that if a firm set its unit price above its average unit cost, its total revenues would cover its total costs, including a fair return on its investment. As long as the firm is not losing money on the units it sells, its behavior is fair competition, and not "predatory" within the meaning of the Robinson-Patman Act. *Id.* at 723, *citing* Areeda & Turner, *Predatory Practices un-*

*der Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697, 704 (1975).

The record in this case contains no evidence, nor even an allegation, that Trane, through Shepherd, sold directly to its customers at a price below its total average unit cost. Indeed, a plaintiff probably could not ever prove primary-line injury against a defendant supplier who is competing directly in the market. The defendant need not sell below its average unit cost to undersell its independent outlets. It may place pressure on the independent outlet simply by selling at a price above average unit cost, but below the independent outlet's resale price.

### III.

In conclusion, we hold that the district court abused its discretion by granting a new trial on the issue of liability, and that it correctly concluded that the evidence adduced at trial was insufficient to support the jury's damage award. We also hold in this case that Eximco was not the victim of Robinson-Patman secondary-line injury because intra-enterprise transfers between Shepherd and Trane, a single economic unit, cannot fulfill the requirement that the defendant make a sale to one competitor at a price different from that which it charges to the plaintiff competitor. We further hold that Eximco was not a victim of Robinson-Patman primary-line injury because it produced no evidence that Trane acted predatorily toward it by pricing below its average total unit cost.

The order of the district court granting a new trial on the issue of damages under the contract is AFFIRMED. Its order granting a new trial on the issue of liability is REVERSED. In all other respects, the order of the district court is

AFFIRMED.

---

probably perceived Trane and Shepherd as a single economic entity.

**10.** A firm is at its profit maximizing position when its unit price equals its marginal cost. The court rejected a marginal-cost test in favor of an average-unit-cost test because calculating

the "incremental cost of making and selling the last unit (i.e., marginal cost) from a conventional business account" is "frequently quite difficult." *International Air Industries*, 517 F.2d at 724.

**518**

TATE, Circuit Judge, concurring in part, dissenting in part:

I concur in the majority's resolution of the new trial issues raised by Eximco on appeal. I respectfully dissent, however, from the majority's holding that the district court properly granted a directed verdict against Eximco insofar as its Robinson-Patman Act claims. I would conclude that the evidence presented by Eximco was sufficient to raise a jury-triable issue on Eximco's claims of Robinson-Patman price discrimination.

It is with some diffidence that I differ from my brethren of the majority, for their scholarly opinion demonstrates far more knowledge of economic theory and of the intricacies of antitrust legislation than I possess. Nevertheless, the majority's conclusion that, as a matter of law, the price discrimination here presented for the jury's determination did not arguably present a Robinson-Patman Act violation—thus justifying the directed verdict here affirmed—is ultimately based upon economic theory and reasons of economic efficiency that, in my opinion, are contrary to the legislative (and perhaps economically inefficient) Robinson-Patman Act objectives of protecting, not competition, but instead the competitor, especially a small businessman.

## I.

By way of overview, let me quote some general observations from ABA Antitrust Section, Monograph No. 4, *The Robinson-Patman Act: Policy and Law*, ·Volume I (1980):

> Enacted in 1936 to strengthen and expand the 1914 Clayton Act's prohibition of price discriminations harmful to competition, the Robinson-Patman Act has generated some of antitrust's most enduring and heated controversies. Opposition to the Act has come from government and bar association task forces, legal scholars, economists and businessmen, who have viewed the Act as inconsistent with basic competition policy, distributive efficiencies, and marketplace realities. Their criticisms frequently have

> been accompanied by calls for repeal or reform. In 1976, the U.S. Department of Justice joined the opposition with a published report on the Act containing alternative legislative proposals aimed at repeal or reform. All of the proposals for satisfactory change have come to naught, however, due to the unswerving support the Act has received from small businessmen, many of whom regard its continued existence as essential to their survival.

*Id.* at 1.

> Essentially three substantive justifications have been offered in favor of a separate price discrimination statute such as the Robinson-Patman Act. A price discrimination statute is said to be necessary (1) to ensure equal competitive opportunity to the small businessman; (2) to control predatory pricing practices; and (3) to prevent encroaching monopoly in distribution. Moreover, advocates have argued that a separate price discrimination statute in general and the Robinson-Patman Act in particular do not place an undue burden on efficient firm behavior.

*Id.* at 22.

Here, Trane, the manufacturer, furnished its product to Shepherd, an independent corporate entity, at a price lower than it furnished its product to the plaintiff Eximco, a retailer competing for the same customers in the same market as did Shepherd. (In fact, the record indicates that the price at which the products were sold by Trane *to* Eximco was higher in some instances than the price that Shepherd quoted to the *customers* for whom Shepherd was competing with Eximco.)

The majority holds, however, that this price discrimination does not fall afoul of the Robinson-Patman Act because Shepherd (although an entirely independent entity and a corporation owned by local businessmen) acted as an agent or distributor for the manufacturer Trane in selling Trane's goods, which were not "sold" to Shepherd for resale but were, rather, furnished by Shepherd to the customer by

delivery through Trane on a price-list set by Trane. Admittedly, from a practical economic point of view, the economic activities of Shepherd could be considered no different than that of a salaried employee of Trane selling products in competition with a retailer reselling products purchased from Trane, the latter not within the prohibition of the Robinson-Patman Act. The trier of fact might well so find.

However, the Robinson-Patman Act politico-economic objectives are cast in terms of protecting one competing local businessman from a price-discrimination by a manufacturer in favor of another competing local businessman. Such discriminatory price treatment is not statutorily allowable in favor of one independent retailer over another, even though the manufacturer might itself be able to compete with the latter by offering lower prices to the public. This Robinson-Patman protection of one local retailer from a manufacturer's price discrimination in favor of another local entity may be economically illogical, but it is statutorily mandated.

Here, however, by directed verdict we conclude that, as a matter of law, this preferential price treatment of one local entity over another local entity can *never* constitute prohibited Robinson-Patman Act price discrimination. I dissent because this issue was withdrawn from decision by the trier of fact, for reasons more particularized below.

## II.

Initially, I cannot agree with the majority's extension of *Security Tire & Rubber Co. v. Gates Rubber Co.*, 598 F.2d 962 (5th Cir.), *cert. denied*, 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309 (1979), to find that Trane and its sales agent Shepherd were a single economic entity. Distinguishably, the *Security Tire* case held that transfers of products between a parent and its wholly-owned subsidiary are not separate sales to a benefitted customer but rather are "the economic equivalent of intra-company transfers of goods", and thus "are not the type of transactions the Robinson-Patman

Act meant to regulate." *Id.* at 966–67. The distribution agent in *Security Tire* was a wholly-owned subsidiary of the parent manufacturer; hence, its profits were essentially those of the manufacturer and, presumably, the manufacturer would direct the distribution activities of the subsidiary to further its—the *manufacturer's*—economic interests. It is not legally illogical, therefore, to view the manufacturer and distributor in such a circumstance to be a "single economic entity", since both entities have identical economic and profit-making interests.

In the present case, however, Shepherd is a profit-making entity entirely independent of Trane. Shepherd has an economic incentive to maximize its Trane sales (by securing preferentially lower prices from Trane) so as to maximize its profits, even to the point of running other Trane distributors (such as Eximco) out of business. Contrariwise, Trane as a manufacturer has an interest in maintaining as extensive a distribution system as possible for its products, an influence upon Trane to establish and maintain distributors such as Eximco— distributors that, differingly, Shepherd would prefer to eliminate in order to increase its own sales. Eximco's business competitor, in the sense of which entity has an incentive to seek to eliminate Eximco from the market, appears to have been Shepherd—not Trane. In light of these differing economic incentives and business motives, I cannot view Trane and Shepherd as a single economic entity for Robinson-Patman Act purposes.

Normal market-place economics would usually obviate the dangers to be posed by the manufacturer Trane against its own distributors, of both primary-line (selling below cost) and secondary-line (unfair price discrimination) economic activity that the Robinson-Patman Act was designed to eliminate. For this reason, for Robinson-Patman Act purposes, we can consider Trane and its subsidiaries as a single economic entity. *See Security Tire, supra.* However, for the reasons noted earlier, we

**520**

cannot similarly treat Trane and Shepherd as a single entity.

For these reasons, I believe that a secondary-line analysis may apply to this case (viewing Eximco and Shepherd as competitors), if both are found to be "purchasers" of the Trane products in question. I agree with the majority that the passage of title of the Trane equipment cannot be used as a talisman to determine whether a party is a "purchaser" under the Act. *See supra,* at 516 (n. 9). Indeed, the determination of whether a party is a "purchaser" must be governed by the substance and not the form of the transactions at issue. *Reines Distributors, Inc. v. Admiral Corporation,* 257 F.Supp. 619 (S.D.N.Y.1965). It is thus a factual issue as to whether the use of a consignee-type distributor (for delivery to customers) at prices lower than the distributor's competitors is prohibited price-discrimination, no less than if the product was directly "sold" to the distributor at a discriminatorily lower price. *See Utah Pie Company v. Continental Baking Co.,* 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967). This factual issue was, in my opinion, incorrectly withdrawn from the jury by the improvidently granted directed verdict.

Here, Shepherd quoted prices from a list provided by Trane, but acted as a independent sales entity, in full competition with Eximco for the same customers. To be sure, the evidence does not mandate a conclusion that Shepherd is a purchaser under the Act—only that such an issue does exist and was improperly cut short of jury fact-resolution by the grant of the directed verdict. By sustaining the directed verdict here granted, the majority as a matter of law exempts this type of consignee price-discrimination from Robinson-Patman Act application and comes perilously close to authorizing easy evasion of the Act by permitting a manufacturer to ignore the objectives of the statute simply by casting its sales to competing retailers in the form of deliveries on order or on consignment to preferred local competitors, characterized as a "distributor."

I therefore respectfully dissent.