598 F.2d 962
 1979-2 Trade Cases 62,773
 SECURITY TIRE & RUBBER COMPANY, a Texas Corporation, and
Security Tire & Rubber Company, a Virginia
Corporation, Plaintiffs-Appellees,
v.
The GATES RUBBER COMPANY, a Colorado Corporation,
Defendant-Appellant.
The GATES RUBBER COMPANY, a Colorado Corporation, Plaintiff-Appellant,
v.
SECURITY TIRE & RUBBER COMPANY, a Texas Corporation, and
Security Tire & Rubber Company, a Virginia
Corporation, Defendants-Appellees.
 No. 77-1943.
 United States Court of Appeals,
Fifth Circuit.
 July 12, 1979.
 
 Thomas L. Case, Louis P. Bickel, Dallas, Tex., for defendant-appellant.
 David B. Kultgen, Waco, Tex., for plaintiffs-appellees.
 Appeals from the United States District Court for the Western District of Texas.
 Before SIMPSON, TJOFLAT and HILL, Circuit Judges.
 JAMES C. HILL, Circuit Judge:
 
 
 1
 This is primarily a price discrimination case brought under Section 2(a) of the Robinson-Patman Act. 15 U.S.C.A. § 13. We hold that Plaintiffs have failed to allege or prove a discriminatory sale to a favored customer.
 
 I.
 
 2
 The factual background and the course of proceedings relevant to our decision today may be briefly summarized.
 
 
 3
 In 1964, Plaintiffs, Security Tire & Rubber Company, a Texas Corporation (Security-Texas), and Security Tire & Rubber Company, a Virginia Corporation (Security-Virginia), embarked on a course of dealing with the Defendant, The Gates Rubber Company, a Colorado Corporation (Gates). This course of dealing eventually led to the present litigation.
 
 
 4
 Defendant Gates is in the rubber manufacturing business. Gates' product line included tires for motor vehicles until the Fall of 1973, when it sold its Nashville, Tennessee tire manufacturing facility to Armstrong Rubber Company. Gates completely ceased tire manufacturing by the Spring of 1974. Plaintiffs, Security-Texas and Security-Virginia were "private brand" sellers of tires, although Security-Texas was not actively selling tires after early 1970. A "private brand" is a line of tires produced for a customer with a brand name, imprinted on the tires, which is owned by and identified with that customer. The Plaintiffs commenced in their venture in 1964, and from then until the Fall of 1973 they purchased most of their tires from Gates. The Plaintiffs marketed tires under the label of "Security" and did business predominantly in the Southeast United States.
 
 
 5
 At the outset, the parties operated under a verbal understanding. Subsequently, they reduced certain terms of their dealing to a written contract on July 17, 1969. The written contract did not set the prices of the tires to be manufactured by Gates and bought by Plaintiffs, nor did it require Plaintiffs to purchase any given number of tires. It merely provided that Plaintiffs were to purchase eighty percent of their requirements from Gates, if Gates produced the type of tire required by Plaintiffs. The written contract also provided for cancellation by any party upon one-hundred and eighty days notice.
 
 
 6
 During the period relevant to this lawsuit, 1969-73, there also existed a wholly-owned subsidiary of Gates, National Tires, Inc. (National). In effect, Gates marketed tires under the National label.
 
 
 7
 The somewhat complicated procedural history of this suit began on February 8, 1974, when Plaintiffs, Security-Texas and Security-Virginia, instituted a lawsuit in the Western District of Texas against Defendant Gates, filed as No. W-74-CA-9. The complaint alleged several different causes of action, including a treble damage action under the Robinson-Patman Act alleging a secondary line discrimination, a claim for a breach of warranty for an alleged failure to manufacture tires properly and a claim for a breach of contract for Gates' alleged failure to give timely notice of the cancellation of the July 17, 1969, contract. The complaint also alleged, and thus admitted, that Plaintiffs were indebted to Gates for tires and demanded that the debt be offset against their damages and that recovery be allowed for damages in excess of the debt. On February 22, 1974, Gates instituted a suit on an account against Security-Virginia in the Chancery Court of Davidson County, Tennessee which was removed to the federal court for the Middle District of Tennessee. By court order, Gates' action was transferred from the Middle District of Tennessee to the Western District of Texas on June 4, 1974, and it was assigned No. W-74-CA-41. The answer in No. W-74-CA-41 incorporated the complaint filed in No. W-74-CA-9 and demanded an offset of damages against the debt owed Gates. The Plaintiffs' cause, No. W-74-CA-9, and Gates' cause, No. W-74-CA-41, were consolidated for purposes of pretrial proceedings and trial.
 
 
 8
 By way of an Amended Complaint in No. W-74-CA-9, which was filed on January 18, 1977, the Plaintiffs abandoned all but three of their claims. The claims contained in the Amended Complaint and tried in the District Court were: (1) the Robinson-Patman treble damage claim; (2) the breach of contract claim for the alleged failure of Gates to manufacture tires in accordance with the warranty and standards of the Federal Department of Transportation; and (3) the breach of contract claim for the alleged failure of Gates to provide Plaintiffs with six months notice of cancellation of the July 17, 1969 contract. Gates' claim on the account against Security-Virginia was asserted in No. W-74-CA-41 and also as a counterclaim in No. W-74-CA-9, but was tried as a companion or consolidated case along with No. W-74-CA-9.
 
 
 9
 Both of the above cases were tried to a jury commencing on March 8, 1977. Gates' claim on the account against Security-Virginia, No. W-74-CA-41, was not submitted to the jury inasmuch as Security-Virginia admitted the account and stipulated that Gates had proven all the elements of its claim on the account. Upon Gates' motion, the District Court entered a judgment on the account. Plaintiffs' claims, No. W-74-CA-9, were submitted to the jury on a general charge, and the jury rendered a general verdict. The jury found for the Plaintiffs on the antitrust claim in the amount of $100,000 and for the Plaintiffs on the claim of breach of contract for failure to give timely notice on the cancellation of the contract in the amount of $3,667. The jury rendered a general verdict for Gates on the Plaintiffs' claim for breach of warranty.
 
 
 10
 On March 23, 1977, the District Court entered a single judgment under both cause numbers. The judgment awarded the Plaintiffs the sum of $303,667, representing the $100,000 on the antitrust claim trebled plus $3,667 on the breach of contract claim for failure to give notice of cancellation. The judgment also awarded Plaintiffs their costs and attorneys' fees, with the proviso that the amount of attorneys' fees would be determined at the conclusion of any appeal which might be taken from the judgment or at such time as the judgment became final. The judgment further awarded Gates $458,235.69, together with interest at the legal rate until paid, on the account against Security-Virginia. The judgment failed to award Gates prejudgment interest, attorneys' fees or costs. An amended judgment was entered on April 20, 1977, which deleted Security-Texas as a prevailing party in No. W-74-CA-9, pursuant to a postjudgment motion made by Gates. However, the amended judgment failed to make any disposition of Security-Texas. To that end, a second amended judgment was entered on May 27, 1977, which provided that Security-Texas take nothing for its causes of action.
 
 II.
 
 11
 Section 2(a), in pertinent part, reads: "It shall be unlawful for any person . . . to discriminate in price between Different purchasers of commodities . . . where Such commodities are sold for use, consumption, or resale within the United States." 15 U.S.C.A. § 13(a) (emphasis added). Courts have interpreted the Section 2(a) language to require that a plaintiff establish two separate and contemporaneous sales transactions made by the same seller to two distinct purchasers. "(N)o single sale can violate the Robinson-Patman Act." Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 755, 67 S.Ct. 1015, 1021, 91 L.Ed. 1219 (1947). Besides being suggested by the very language of the statute, the requirement of two transactions is implicit in the purpose of the Robinson-Patman Act. Anticompetitive price discrimination among competing buyers is the evil the statute prohibits. For price discrimination to occur, it is axiomatic that one purchaser must pay more than another purchaser; there must be two or more transactions at different prices. See generally Areeda, Antitrust Analysis PP 701-740 (2d ed. 1974); Kitner, A Robinson Patman Primer 77-78 (1970); Rowe, Price Discrimination under the Robinson Patman Act (1964); Sullivan, Antitrust §§ 217-19, 222-25 (1977); Von Kalinowski, Antitrust Laws & Trade Regulations § 24.03 (1975). See also generally, e. g., Hampton v. Graff Vending Co., 516 F.2d 100, 102 (5th Cir. 1975); Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203, 208 (5th Cir. 1969); Hiram Walker, Inc. v. A & S Tropical, Inc., 407 F.2d 4, 7 (5th Cir.), Cert. denied, 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969); Hartley & Parker Inc. v. Florida Beverage Corp., 307 F.2d 916 (5th Cir. 1962).
 
 
 12
 The theory and proof of Plaintiffs' case assigned National the role of their competitor and the beneficiary of Gates' price discrimination the so-called "favored customer." Plaintiffs sought to assign themselves the roles of the victims of Gates' price discrimination the so-called "disfavored customers." It is important to note that National, the wholly-owned subsidiary of Gates, was the only customer of Gates alleged to have been favored; there was neither any further allegation nor proof of any other beneficiary of Gates' alleged price discrimination.
 
 
 13
 Assuming Arguendo that Plaintiffs established the other prerequisites for a recovery, their theory and proof would support the jury's verdict only if the transfers of tires from Gates to its wholly-owned subsidiary, National, were considered sales within the meaning of the Robinson-Patman Act. Today, we reject what little authority we have found supporting the theory that under some circumstances a parent corporation's transfers to its wholly-owned subsidiary may be considered separate sales to a favored customer in a Robinson-Patman Act price discrimination suit. Briefly, we shall explore the history of this theory and explain why we are not persuaded to follow in its future. Ours is a different course. We hold that transfers from a parent corporation to its wholly-owned subsidiary corporation can never be considered separate sales to a favored customer in a Robinson-Patman Act discrimination suit.
 
 
 14
 The origins of the theory we reject today lie in Danko v. Shell Oil Co, 115 F.Supp. 886 (E.D.N.Y.1953). In Danko the operator of a gasoline retail station sued a gasoline distributor and alleged, "the defendant directly or indirectly owns, operates, maintains and controls a gas station within one mile of plaintiff's station and Grants itself preferential treatment and discriminates against the plaintiff." Id. at 888 (emphasis added). Thus, the plaintiff in Danko alleged, Inter alia, that it was the disfavored customer and sought to compare its purchases from the defendant with sales from the defendant to the defendant's wholly-owned retail gasoline stations to establish a price discrimination. The District Court denied the defendant's motion to dismiss for failure to state a claim on which relief could be granted without providing any economic, antitrust analysis and without citing any significant controlling precedent:
 
 
 15
 The fact that defendant itself may own and control such filling station would not destroy the relationship of vendor and purchaser. In any event, it is doubtful that such relationship, if discriminatory, would be permitted to accomplish such objective. See for analogy, Timken Roller Bearing Co. v. United States, 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199, and cases cited therein. That the Court actually looks behind form to see who the real competitors are, see American Cooperative Serum Ass'n v. Anchor Serum Co., 7 Cir., 153 F.2d 907, 913, 914. Surely, all of these unresolved factual questions, coupled with the statement in Bruce's Juices v. American Can Co., 330 U.S. 743, 755, 67 S.Ct. 1015, 91 L.Ed. 1219, with respect to what types of sales are actually discriminatory, constrain the Court to overrule the objection to the third cause of action.
 
 
 16
 Id. With the off-hand observation, "The fact that defendant itself may own and control such filling station would not destroy the relationship of vendor and purchaser," the District Court, seemingly unwittingly, created antitrust theory. At least, the District Court declined to dismiss the complaint which it understood to depend upon such a theory.
 
 
 17
 The apparent basis of this theory is found in the general postulate of antitrust law that substance and true competitive function control rather than corporate form. By analogy, the District Court relied on Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951) which involved the rather remote question whether a partially-owned subsidiary corporation could conspire with its parent corporation in violation of the Sherman Act. See also Perkins v. Standard Oil Co., 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969); Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 215, 71 S.Ct. 259, 95 L.Ed. 219 (1951). The validity of this antitrust postulate is beyond peradventure, and with it we have no quarrel. There usually is no substitute for a careful analysis of the economic realities presented by the facts of a given case in light of the underlying purpose of the relevant antitrust statute. We simply refuse to follow the Danko analogy here. At the same time, we do not seek to exalt form over substance. Instead, we are convinced that substance may be coincident with form and that this is such a situation. If there be a form versus substance issue here, we are quite convinced that our antitrust analysis more properly emphasizes substance over form than the theory we reject today.
 
 
 18
 Although several courts have noted the theory first suggested in Danko, we have found no reported decision in which a Robinson-Patman Act damage award was actually sustained on the basis of the theory.[1] We decline to be the first, for we are left unpersuaded by the mere repetition of all this encysted Obiter dictum.[2]
 
 
 19
 Here, we deem it sensible to treat parent corporation and wholly-owned subsidiary corporation as a single economic unit. See Areeda, Antitrust Analysis P 701 n.13 (2d ed. 1974). There are other situations in which the single economic unit approach is applied which we find much more relevant to the issue at hand than the Danko analogy. If there is an affirmative showing that the parent actively controls a wholly-owned sales subsidiary, then the subsidiary's sales are attributable to the parent. Thus, a plaintiff might establish a Robinson-Patman Act violation if the evidence shows a price discrimination between a customer of the parent corporation and a customer of the wholly-owned subsidiary. The subsidiary and parent are treated as the same seller. The identical analysis is applied to determine whether a remote purchaser-plaintiff is an indirect purchaser from a seller which is involved in its customer's dealings with the plaintiff. See generally Hiram Walker, Inc. v. A & S Tropical, Inc., 407 F.2d 4 (5th Cir.), Cert. denied, 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969); Baim & Blank, Inc. v. Philco Corp., 148 F.Supp. 541 (E.D.N.Y.1966). See also generally Von Kalinowski, Antitrust Laws & Trade Regulations § 24.04(2), (3) (1975). These theories, which are neither invoked nor involved here, highlight the theoretical flaw in the Danko approach. In the application of both the same seller doctrine and the independent purchaser doctrine, the parent and wholly-owned subsidiary are treated as a single economic unit. Thus, sales from the same economic unit to the favored customer and to the disfavored customer are compared to determine whether there has been a price discrimination. The requirement of two sales is satisfied. The Danko theory lacks this requirement. Under Danko, a sale from the parent corporation to the plaintiff is alleged as the disfavored sale. However, there is no sale to a favored customer for comparison and thus no price discrimination may be shown. Transfers from a parent corporation to its wholly-owned subsidiary corporation are transfers within the same economic unit. These transfers are the economic equivalent of intra-company transfers of goods. As such, these transfers cannot be considered sales for Robinson-Patman Act purposes. See generally authorities cited in note 1, Supra. See also generally Von Kalinowski, Antitrust Laws & Trade Regulation § 24.03(2) (1975).
 
 
 20
 The Robinson-Patman Act separates out and makes illegal competitively harmful discrimination. Intra-corporate transfers and transfers between parent and wholly-owned subsidiary are not the type of transactions the Robinson-Patman Act meant to regulate. The realistic effect on competition should control rather than esoteric and theoretical possibilities under the Danko theory couched in terms of "control" and "arm's length dealings." Realistically, the competition here was between Gates and National as a single economic unit, on the one hand, and Plaintiffs, on the other hand. Internal transfers between Gates and National were of no real competitive consequence. There is nothing in this record to suggest that disregarding the separate corporate entities will enable Gates and National to circumvent the Robinson-Patman Act. See generally Brown v. Hansen Publications, 556 F.2d 969, 972 (9th Cir. 1977); Brewer v. Uniroyal, Inc., 448 F.2d 972, 977 n.2 (6th Cir. 1974); Mowery v. Standard Oil Co., 463 F.Supp. 762, 775-76 n.17 (N.D.Ohio 1976); Diehl & Sons, Inc. v. International Harvester Co., 426 F.Supp. 110, 123 (E.D.N.Y.1976); Snyder v. Howard Johnson's Motor Lodges, Inc., 412 F.Supp. 724, 731 (S.D.Ill.1976). In this manner underlying substance controls surface form in economic and antitrust importance. In form, Gates sought to raise a corporate veil between its manufacturing and sales efforts by conducting its own retail operations through a separate corporate entity. There being no other owner of National besides Gates, the substance of this marketing technique was simply that a single economic unit manufactured and marketed its product. Therefore, we hold that a parent corporation's transfers to its wholly-owned subsidiary may not be considered separate sales to a favored customer in a Robinson-Patman Act price discrimination suit. Since National was the only customer of Gates alleged to have been favored and since there was neither any further allegation nor proof of any other beneficiary of Gates' alleged discrimination, Plaintiffs have failed to establish the requisite favored sale for a Robinson-Patman Act suit.[3]
 
 III.
 
 21
 The remaining issues Gates raises need not long detain us. First, we are not persuaded by Gates' efforts to upset the breach of contract recovery. Second, we do not believe that the District Court abused its discretion in denying Gates prejudgment interest in No. W-74-CA-41. Third, given our reversal of the Robinson-Patman Act claim, we deem it appropriate to remand for a reassessment of the issue of costs before the District Court in No. W-74-CA-41; costs on this appeal are awarded to Gates as the prevailing party. Fourth, we find no error in the District Court's failure to award Gates attorneys' fees in No. W-74-CA-41. Finally, we reject Gates' claim that it was entitled, as a matter of right, to two separate judgments here.
 
 IV.
 
 22
 In summary, in No. W-74-CA-9, the Robinson-Patman Act claim is reversed, the breach of contract claim is affirmed; in No. W-74-CA-41 we affirm except we remand for reassessment of the issue of costs before the District Court.
 
 
 23
 REVERSED in part; AFFIRMED in part; and REMANDED.
 
 
 
 [1]
 Parrish v. Cox, 586 F.2d 9, 11-12 (6th Cir. 1978); Brown v. Hansen, 556 F.2d 969 (9th Cir. 1977); Brewer v. Uniroyal, Inc., 498 F.2d 973, 977 n.2 (6th Cir. 1974); Mowery v. Standard Oil Co., 463 F.Supp. 762, 775-776 n.17 (N.D.Ohio 1976); Schaben v. Samuel Moore and Co., 462 F.Supp. 1321, 1330 (S.D.Iowa 1978); Diehl & Sons, Inc. v. International Harvester Company, 426 F.Supp. 110, 123 (E.D.N.Y.1976); Snyder v. Howard Johnson's Motor Lodges, Inc., 412 F.Supp. 724, 730-31 (S.D.Ill.1976); Hawaiian Oke & Liquors, Ltd. v. Joseph E. Seagram & Sons, Inc., 272 F.Supp. 915, 919 (D.Haw.1967); Reines Distributors, Inc. v. Admiral Corporation, 241 F.Supp. 814, 815, 256 F.Supp. 581, 585-86, 257 F.Supp. 619, 621 (S.D.N.Y.1965). The unofficially reported decision in Mississippi Petroleum Inc. v. Vermont Gas Systems, Inc., 1972 Trade Cases P 73, 843 (S.D.Miss.1972) is not to the contrary
 
 
 [2]
 Long ago, Mr. Justice Holmes once lamented: "It is one of the misfortunes of the law that ideas become encysted in phrases and thereafter for a long time cease to provoke further analysis." Hyde v. United States, 225 U.S. 347, 391, 32 S.Ct. 793, 811, 56 L.Ed. 1114 (1912) (Holmes, J., dissenting)
 
 
 [3]
 Pragmatically our rejection or acceptance of the Danko theory would not change the fate of Plaintiffs' appeal. Even under the theory we reject, the separateness of parent and wholly-owned subsidiary must be established in order for a transfer between them to be considered a favored sale. There must be some showing of a lack of control by the parent and arm's length dealings between parent and subsidiary. See authorities cited note 1, Supra. The Plaintiffs here depend on little else but the appearances of independence incident to Gates' and National's separate corporate status. Gates exercised full dominion and control over National; there was no arm's length dealings between them. Thus, on this record we would reverse even under the Danko theory had we found the theory itself persuasive. See Boeing v. Shipman, 411 F.2d 365 (5th Cir. 1969) (appellate standard for review of jury verdict)
 Those who suffer real antitrust damage are not necessarily left without any antitrust remedy either under our own analysis or under an unsuccessful attempt to recover on the Danko theory we reject. See, e. g., Schaben v. Samuel Moore and Company, 462 F.Supp. 1321, 1332 (S.D.Iowa 1973); Reines Distributors, Inc. v. Admiral Corp., 256 F.Supp. 581, 586 (S.D.N.Y.1966).