**ACME REFRIGERATION OF BATON ROUGE, INC., Plaintiff-Appellee,**

v.

**WHIRLPOOL CORPORATION & Heil-Quaker Corporation, Defendants-Appellants.**

No. 85–4043.

United States Court of Appeals, Fifth Circuit.

March 28, 1986.

Opinion on Denial of Rehearing and Rehearing En Banc April 28, 1986.

---

Michael R. Turoff, Arnstein, Gluck, Lehr, Barron & Milligan, John L. Ropiequet, Chicago, Ill., Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Timothy J. McNamara, Lafayette, La., for defendants-appellants.

Wallace A. Hunter, Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, La., for plaintiff-appellee.

Before BROWN, REAVLEY and HILL, Circuit Judges.

REAVLEY, Circuit Judge:

Defendants Whirlpool Corporation and Heil-Quaker Corporation appeal the district court's judgment in favor of plaintiff Acme Refrigeration of Baton Rouge, Incorporated (Acme). We reverse.

### FACTS

This litigation focuses on the sale of "Whirlpool" brand heating and air conditioning equipment in a thirteen-parish area located in southwest Louisiana (the "trade area"). The equipment is manufactured by Heil-Quaker, a Delaware corporation, at its plants in Tennessee. At the time of trial, Heil-Quaker marketed its products by contracting with 54 distributors.

Whirlpool, another Delaware corporation, is a major manufacturer of household appliances and other "white goods," and its thirteen sales divisions distribute these products nationwide. In addition, three of its sales divisions[1] sold heating and air conditioning equipment, contracting with Heil-Quaker as their supplier. One of these three divisions, the Houston, Texas sales division ("HSD"), sold this equipment well outside the geographic region specified in its agreement with Heil-Quaker, that region being the Houston metropolitan area. Besides selling this equipment to buyers located in other Texas cities, HSD contracted with two Louisiana distributors who serviced the trade area, Cooling and Heating, Incorporated (located in Lafayette) and Cooling & Heating of Lake Charles, Incorporated (collectively, "C & H").

On January 1, 1981, Acme purchased the assets of C & H. On March 2, HSD executed a Dealer Sales Agreement (the "Agreement") with Acme, supplying it with Whirlpool brand equipment for the remainder of the year. Although no written contract was executed for 1982, the Agreement contained an automatic renewal clause, which provision was subsequently triggered by HSD's failure to give Acme timely notice of its decision not to renew their contract for 1982.[2]

By the end of 1981, Heil-Quaker, disappointed with its share of the Houston market, decided that HSD should concentrate all its efforts on the Houston area. Unaware of any formal agreements HSD had executed, Heil-Quaker directed HSD to sever its "associate distributorships" by June 30, 1982. Contemporaneously, Heil-Quaker sought a distributor which could service all of the major Louisiana markets, including those outside the trade area. On April 21, 1982, Heil-Quaker appointed Solar Supply Company, Incorporated (Solar) to be its exclusive distributor in Louisiana. Solar's entry into the market immediately ended Acme's monopoly in the trade area. Moreover, Acme found itself at a competitive disadvantage because Solar—buying directly from Heil-Quaker instead of from HSD—was able to lower its cost of supply and pass the savings on to its customers.

Acme stopped buying equipment from HSD in July of 1982 and brought this suit in the district court. In its amended complaint, Acme charged, *inter alia*,[3] (1) that Heil-Quaker, as a wholly-owned subsidiary of Whirlpool, is the "alter ego" of Whirlpool, (2) that Heil-Quaker's sales are therefore imputable to Whirlpool, (3) that Whirlpool discriminated in price between Acme and Solar[4] in violation of § 2 of the Clayton Act of 1914, as amended by the Robinson-Patman Act of 1936, 15 U.S.C. § 13 (1982) (the "Act"), (4) that its Agreement with HSD was breached because it was forced to stop making purchases under that contract, and (5) that HSD had made several fraudulent misrepresentations. The jury returned a verdict in favor of Acme on all its claims and awarded $252,612 in damages. The trial court, entering judgment against defendants Whirlpool and Heil-Quaker on the antitrust claim, trebled damages to $757,837.[5] This appeal followed the trial court's denial of defendants' motions for a judgment n.o.v. and for a new trial.

## DISCUSSION

### A. *Price Discrimination*

In order to make a claim of price discrimination, a plaintiff must allege that a given

---

1. These sales divisions are located in Houston, Texas; Kansas City, Missouri; and Charlotte, North Carolina.

2. The Agreement called for HSD to notify Acme at least thirty days prior to the contract's expiration, December 31, 1981. It is undisputed that HSD failed to give such notice.

3. The trial court dismissed Acme's claims based on Louisiana antitrust law and its claim based on § 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 (1982).

4. The price charged Acme by Whirlpool's Houston sales division was higher than the price charged Solar by Heil-Quaker.

5. The court's judgment as to Acme's contract and tort claims was conditioned upon the judgment it entered on the antitrust claim.

commodity was sold to two different buyers at two different prices by the same seller. For years courts have wrestled with the problem of determining how affiliated corporations fit into this scheme. Whirlpool and its wholly-owned subsidiary, Heil-Quaker, are distinct legal entities. The district court, however, treated the two as one. Relying on *Security Tire & Rubber Co. v. Gates Rubber Co.*, 598 F.2d 962 (5th Cir.1979), *cert. denied*, 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309 (1980), the trial judge held that, as a matter of law, a parent corporation and its wholly-owned subsidiary constitute a single economic unit, and he instructed the jury to consider Whirlpool and Heil-Quaker as the same seller.[6] We conclude that the trial judge misinterpreted *Security Tire.*

In *Security Tire*, a parent corporation and its wholly-owned subsidiary sold the same commodity, the subsidiary selling only what was first transferred to it by the parent. The plaintiff, who bought from the parent, charged that the subsidiary received a lower price. A panel of this circuit held that, as a matter of law, transfers from a parent corporation to its wholly-owned subsidiary cannot be considered "sales" to a "favored" buyer. 598 F.2d at 967. Because the plaintiff did not allege that the parent favored any other buyer, the court could find no price discrimination.

■ Although it attached no competitive significance to the price charged a subsidiary by its parent, the court emphasized that its holding was limited to situations where the subsidiary acted as buyer, not seller. Acknowledging that a subsidiary's own sales can form the basis for a claim of price discrimination, the court expressly left intact the "same seller" doctrine. *Id.* at 966. Under such a theory, a subsidiary's sales are imputed to its parent if the latter "actively controls" the former. *Id.* Therefore, if a parent and its "controlled" subsidiary charge different buyers differ-

ent prices for the same commodity, they will have violated the Act. The same seller doctrine, however, is not to be invoked merely upon a showing that one seller is wholly owned by another. Instead, there must be an "affirmative showing" that the parent actively controls its subsidiary. *Id.* See III E. Kintner & J. Bauer, *Federal Antitrust Law* § 21.16, at 212 (1983); 4 J. von Kalinowski, *Antitrust Laws and Trade Regulation* § 24.04[2][a] (1985).

■ In the absence of evidence that Whirlpool either actively controlled Heil-Quaker or the terms of the latter's sales, we must conclude that they are not the same seller. *See Hiram Walker, Inc. v. A & S Tropical, Inc.*, 407 F.2d 4, 8 (5th Cir.), *cert. denied*, 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969); *Baim & Blank, Inc. v. Philco Corp.*, 148 F.Supp. 541, 543–44 (E.D.N.Y.1957). In its amended complaint, Acme acknowledged that Whirlpool and Heil-Quaker were separate corporations; nevertheless, it alleged that Heil-Quaker was the "alter ego" of Whirlpool. Whirlpool and Heil-Quaker moved for summary judgment, arguing that no factual dispute existed concerning their corporate relationship, that the undisputed facts demonstrated that Whirlpool did not actively control Heil-Quaker, and that they could not otherwise be considered the same seller. Attached to their motion were various affidavits, including those of HSD's general manager and Heil-Quaker's vice-president of marketing. These officials stated that Heil-Quaker's president and chief executive officer was neither an officer nor a director of Whirlpool; that all of Heil-Quaker's distributors operated under year-long contracts which were approved—then later either renewed or terminated at the close of the year—solely by Heil-Quaker, a decision reached without any participation by Whirlpool; that Heil-Quaker had previously not renewed distributorship contracts with other Whirlpool sales divisions because of poor performance; that Heil-Quaker's prices,

---

**6.** Previous to this instruction, the trial court, had denied the summary judgment motion of Whirlpool and Heil-Quaker, who argued that they

were not the same seller because the undisputed facts established that Whirlpool did not control Heil-Quaker.

terms and conditions of sale were determined and established solely by its personnel; and that HSD's prices, terms and conditions of sale were determined and established without consultation with Heil-Quaker.

The extent of Acme's evidence in opposition was an affidavit of its accountant, who stated that Whirlpool prepared and filed its financial reports on a consolidated basis. Acme failed to raise an issue of material fact concerning Whirlpool's alleged control of Heil-Quaker; furthermore, Acme has never pleaded actual control and does not now suggest that any other evidence exists in its favor bearing on the issue of control. We conclude that the uncontroverted facts establish that Whirlpool and Heil-Quaker are not the same seller. Moreover, Acme did not allege that Whirlpool and Heil-Quaker, considered separately, discriminated in price. Therefore, we hold that Acme failed to raise any issue of price discrimination. Defendants' motion for summary judgment should have been granted. Failing this, their motion for judgment n.o.v. should have been granted.

### B. Acme's State Claims

Acme was forced to choose between holding firm on price, thereby losing sales to Solar, and slashing prices, thereby making its sales unprofitable. Moreover, shortly after its appointment in April of 1982, Solar began informing its customers that, 90 days hence, Acme would no longer be distributing Whirlpool products. Declining to add to its mounting inventory, Acme stopped buying equipment and brought this suit instead, charging that blame lay with Whirlpool.

### 1. Breach of Contract

■ Acme's theory that its Agreement with HSD was breached is a confused one. On one hand, Acme identified the breach—and the court so instructed the jury—as

Heil-Quaker's selection of Solar to be its exclusive distributor in Louisiana. On the other, Acme charged that its inability to continue making purchases under the Agreement constituted a breach thereof. Under either theory, we find no evidence whatsoever that HSD breached the Agreement. Therefore, the trial court erred by denying defendants' motion for a judgment n.o.v. See Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969) (en banc).

Heil-Quaker's appointment of Solar is of no consequence. By its own terms, the Agreement was non-exclusive.[7] Moreover, Solar became Heil-Quaker's distributor, not HSD's.[8] Finally, it was Acme's decision to stop buying equipment, and there is no evidence—nor does Acme allege—that HSD violated a specific provision of their Agreement or that HSD was unwilling to supply Acme for the balance of 1982. We conclude that no breach of contract is shown.

### 2. Fraudulent Misrepresentation

Acme's fraud claim is based on statements allegedly made by Tom Bowers, now deceased,[9] who, as one of HSD's three sales managers, headed its heating and cooling department. The alleged misrepresentations are that Bowers told Acme in January of 1982 that it would have an exclusive distributorship throughout 1982; that, in April of 1982, Bowers denied the fact of Solar's appointment; and that Bowers told Acme in May of 1982 that it would be charged the same prices that Heil-Quaker charged Solar. We conclude that the record will not support Acme's claim, and a judgment n.o.v. would have been proper. See Boeing, 411 F.2d at 374.

Our resolution of Acme's claim requires that we consider the interests of the various parties involved. Heil-Quaker's disenchantment with HSD had less to do with HSD's association with Acme than it did

---

7. We consider below Acme's contention that HSD represented that Acme was to remain the exclusive Whirlpool distributor in the trade area.

8. We note that Acme had a claim of interference with business relations lodged against Heil-Quaker. Such a claim, however, does not reach HSD. Upon Heil-Quaker's motion, the court dismissed Acme's claim prior to trial.

9. Bowers died the month after this suit was brought.

with HSD's failure to penetrate the Houston market. Bowers' reluctance to accommodate Heil-Quaker's request to terminate HSD's relationship with Acme had less to do with notions of a contractual obligation [10] than it did with the fact that Acme was a source of considerable business and profit to HSD. Finally, there is no evidence—and Acme does not allege—that Heil-Quaker could have or would have suspended its own sales to HSD if HSD refused to stop selling to Acme.

■ Turning now to Bowers' first statement, Acme argues that Bowers knew since December of 1981 that Heil-Quaker wanted Acme phased out by June 30, 1982. We have already ruled that the HSD-Acme Agreement was not breached, and the evidence reveals that Bowers was steadfastly reluctant to terminate HSD's relationship with Acme. Moreover, there is no evidence that Bowers believed his negotiations with Heil-Quaker ever reached the point where the HSD-Acme Agreement was imperiled. In fact, at the time of the December meeting, Heil-Quaker itself considered selling directly to Acme. The evidence of Bowers' statement as to Acme's distributorship in 1982 does not support a fraud claim. As to the distributorship being exclusive, Acme's claim is defective in two respects. Heil-Quaker controlled the distribution of the products it manufactured. Because Bowers could not bind or otherwise make decisions for Heil-Quaker, it would have been unreasonable to rely on Bowers' promise that Acme's distributorship would remain exclusive. Furthermore, the trial court correctly instructed the jury that unfulfilled promises cannot form the basis for fraud. *See Gamble v. Carter*, 378 So.2d 185, 186 (La.App.1979); *Swann v. Magouirk*, 157 So.2d 749, 751 (La.App.1963).

As to Bowers' denial of Solar's appointment, Acme relies upon the testimony of its equipment manager, Commodore Lloyd, who testified that he called Bowers twice, a week before and about a week after Solar's appointment on April 21, 1982. The evidence indicates that the extent of Bowers' knowledge, gained subsequent to Lloyd's first phone call, was merely that Solar was under consideration by Heil-Quaker for a distributorship. As to the second phone call, made nine days after Solar signed the contract and three days before Acme itself received formal notification, Acme's Lloyd testified only that Bowers said he "still didn't know anything." Acme's own exhibit, an inter-office memorandum written by Bowers, reinforces the fact that Bowers was not privy to the corporate decisions of either Solar or Heil-Quaker. We conclude that the evidence does not support Acme's claim that Bowers' statements were false.

■ Finally, Bowers' statement regarding pricing was not a representation but was instead a promise to do something in the future, thereby not being actionable as fraud. Although an exception to the rule is made where it is proved that the promiser had no intention of fulfilling his promise, *see Gamble*, 378 So.2d at 186, there is no evidence here to support—and Acme does not make—such an allegation.

REVERSED AND REMANDED for dismissal.

## ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

Before BROWN, REAVLEY and HILL, Circuit Judges.

PER CURIAM:

By our prior opinion we intended to make no holding to locate or measure the burden of proof on the issue of control by the parent corporation of its wholly owned subsidiary where a buyer urges that the parent and subsidiary are guilty of price discrimination. The evidence on that issue in this case denied that control, and neither pleading nor proof from the buyer implicated the existence of control.

---

10. HSD entered into many distributorship contracts, which numbered 233 in 1984. Charles Pitner, HSD's general manager, testified that HSD was able to sever its contracts with some

of its other associate distributors because of a contractual provision allowing termination, upon 30 days' notice, if based upon dissatisfaction with performance.

The Petition for Rehearing is DENIED and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Federal Rules of Appellate Procedure and Local Rule 35) the Suggestion for Rehearing En Banc is DENIED.