UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

No. 93-1653

CARIBE BMW, INC.,

Plaintiff, Appellant,

v.

BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Raymond L. Acosta, U.S. District Judge]

Before

Breyer, Chief Judge,
Coffin, Senior Circuit Judge,
and Boudin, Circuit Judge.

Anne M. Rodgers with whom William R. Pakalka, Fulbright &
Jaworski, L.L.P., Enrique J. Mendoza Mendez, Law Offices of Enrique J.
Mendoza Mendez, Randall A. Hopkins, Randall A. Hopkins, P.C., Dahr
Jamail, Jamail & Kolius, Thomas R. McDade, and McDade & Fogler,
L.L.P., were on brief and reply brief for appellant.
Irving Scher and Manuel A. Guzman with whom Bruce A. Colbath,
Weil, Gotshal & Manges and McConnell Valdes were on brief for
appellees.

March 25, 1994


BREYER, Chief Judge. This appeal raises two

issues of antitrust law. First, do a firm's wholly owned

subsidiary and the firm itself amount to a "single seller"

under the Robinson-Patman Act? 15 U.S.C. 13. Second, can

a retailer's lost profit, brought about by a maximum resale

price fixing agreement between that retailer and its

supplier, amount to an "antitrust injury," thereby giving

that retailer "standing" to obtain treble damages? Atlantic

Richfield Co. v. USA Petroleum Co. ("ARCO"), 495 U.S. 328

(1990); Albrecht v. Herald Co., 390 U.S. 145 (1968). We

answer both these questions in the affirmative. Because the

district court's dismissal of the plaintiff's complaint

rested upon negative answers to the same questions, we set

its dismissal aside.

I

Background

From 1981 through 1990, Caribe BMW, Inc.

("Caribe"), through contracts with the German BMW

manufacturer, Bayerische Motoren Werke Aktiengesellschaft

("BMW AG"), bought BMW automobiles from BMW AG in Germany,

imported them into Puerto Rico, and sold them at retail. In

February 1991, Caribe (the appellant here) brought this

lawsuit against (the appellees) BMW AG and BMW's wholly

-2- 2

owned North American subsidiary, BMW of North America, Inc.

("BMW NA"). Caribe's complaint (actually, its second

amended complaint), with commendable simplicity, listed four

counts.

Count I charged a violation of the Robinson-Patman

Act. 15 U.S.C. 13. It said that BMW AG sold cars to BMW

NA, which resold those cars to other retailers who competed

with Caribe, at prices lower than, or on terms more

favorable than, those at which BMW AG sold similar cars to

Caribe. Count II charged a violation of 1 of the Sherman

Act. 15 U.S.C. 1. It said that BMW AG had set maximum

resale prices for the cars that it sold to Caribe by

"threaten[ing] to terminate Caribe's contracts" unless

Caribe would agree, in effect, to maintain low resale

prices. Count III charged "breach of contract." It listed

various ways in which BMW AG had allegedly broken its word.

Count IV charged that, in terminating its contract with

Caribe, BMW AG had violated Puerto Rico's Dealers' Contracts

Act, more familiarly known as Act 75. P.R. Laws Ann. tit.

10, 278 et seq.

The district court dismissed the complaint for two

related reasons. First, it found that the complaint's two

antitrust counts "fail[ed] to state a claim upon which

-3- 3

relief can be granted." Fed. R. Civ. P. 12(b)(6). Second,

it noted that a forum selection clause in the contracts

between Caribe and BMW AG provided for "exclusive

jurisdiction" in "Germany" to resolve "disputes" about the

"termination of" or "rights and duties arising out of" the

agreement. It found this clause applicable to the remaining

(non-antitrust) claims, and it dismissed those claims "for

improper venue" or, in the alternative, "on grounds of forum

non conveniens." Caribe BMW, Inc. v. Bayerische Motoren

Werke Aktiengesellschaft , 821 F. Supp. 802 (D.P.R. 1993).

Caribe appeals.

When reviewing the dismissal of the antitrust

claims we take the facts basically as stated in the

complaint and make reasonable inferences that will help the

plaintiff. Garita Hotel Ltd. Partnership v. Ponce Fed.

Bank, F.S.B., 958 F.2d 15, 17 (1st Cir. 1992). After

examining those facts, in light of the relevant law, we

conclude that the district court should not have dismissed

the antitrust claims. And, that conclusion requires the

district court to reexamine dismissal of the other claims as

well.

II

The Robinson-Patman Act Claim

-4- 4

The Robinson-Patman Act forbids "any person" 

to discriminate in price between
different purchasers of commodities of
like grade and quality . . . where the
effect of such discrimination may be . .
. to injure . . . competition with any
person who . . . grants . . . the . . .
discrimination, or with [that granting
person's] customers . . . .

15 U.S.C. 13(a). Caribe's complaint alleges most of the

essentials of a violation. It says that a "person" has

"discriminate[d] in price between different purchasers"

(namely, Caribe and other retailers in competition with

Caribe) of cars, with the effect that "competition with"

that person's "customer" (namely, Caribe) is "injure[d]."

See FTC v. Morton Salt Co., 334 U.S. 37, 45 (1948). But, it

embodies an ambiguity in respect to the "person" who did the

discriminating. It says that BMW AG sold cars directly to

Caribe, which resold them at retail. It then says that BMW

NA sold cars to other retailers, who compete with Caribe, at

lower prices than BMW AG sold its cars to Caribe. At this

point, there appear to be two "persons" selling BMWs to

retailers, namely, BMW AG (selling them to Caribe) and BMW

NA (selling them to Caribe's competitors). The complaint

adds, however, that BMW NA is the wholly owned subsidiary of

BMW AG. Thus, we must face the legal question of whether or

not this last mentioned fact is sufficient to make of the

-5- 5

two separately incorporated companies a single "person" for

Robinson-Patman Act purposes. If so, the complaint properly

alleges that a single "person" has sold similar goods at two

different prices (allegedly with the required statutory

effect). If not, there may be no "person" who has

"discriminate[d]." See id. ("discrimination" requires at

least two sales by a single person at different prices to

different customers in competition with each other); see

also Phillip Areeda & Louis Kaplow, Antitrust Analysis 

601(c) (4th ed. 1988); 3 Earl W. Kintner & Joseph P. Bauer,

Federal Antitrust Law 21.11, at 192-93 (1983).

So far, when courts have faced this question --

whether or not a firm and its subsidiary amount to a single

"person" (or a "single seller") -- they have answered it by

examining the extent of common ownership and the degree of

control over pricing and distribution policies that the one

exercises over the other. See Acme Refrigeration of Baton

Rouge, Inc. v. Whirlpool Corp., 785 F.2d 1240, 1243 (5th

Cir.) (100% ownership, without control, not enough to create

a "single seller"), cert. denied, 479 U.S. 848 (1986);

Island Tobacco Co. v. R.J. Reynolds Indus., Inc., 513 F.

Supp. 726, 734 (D. Haw. 1981) (same); Baim & Blank, Inc., v.

Philco Corp., 148 F. Supp. 541, 543-44 (E.D.N.Y. 1957)

-6- 6

(same); Massachusetts Brewers Ass'n v. P. Ballantine & Sons

Co., 129 F. Supp. 736, 739 (D. Mass. 1955) (same); see also

Kintner & Bauer, supra, 21.16 at 212. In this case, the

extent of ownership is 100%; Caribe's complaint alleges

nothing about actual control. Thus, we must ask whether

100% ownership, by itself, amounts to a sufficient

allegation that the "firm plus subsidiary" are a single

Robinson-Patman Act "person." We conclude, for reasons that

we shall now explain, that it does.

For purposes of clarity, we shall refer in our

explanation to hypothetical entities whom we shall call 1)

the Manufacturer (M), 2) its wholly owned Distributor (D),

3) the Retailer (R1) who buys from D, and 4) the Direct

Buying Retailer (DBR), who buys directly from M and who

resells in competition with R1. The distribution

arrangement looks like the following:

M

D

R1 DBR

-7- 7

In our case, BMW AG holds the position of M; BMW NA, the

position of D; Caribe, the position of DBR; and Caribe's

unspecified retail competitors, the position of R1. The

legal question, put in terms of the diagram, is whether or

not M's 100% ownership of D makes M and D, together, a

"single seller," say "MD." If so, a single "person"

(allegedly) "discriminates" in price.

We now return to the reasons for our affirmative

answer, which are three. First, in 1984, after many of the

above-cited "single seller" cases were decided, the Supreme

Court decided Copperweld Corp. v. Independence Tube Corp.,

467 U.S. 752 (1984). The Court there considered the scope

of Sherman Act 1's word "conspiracy." It held that the

word did not cover an agreement between a wholly owned

subsidiary and its parent, because a wholly owned subsidiary

could not "conspire" with the parent. That, the Court said,

is because they have

a complete unity of interest. Their
objectives are common, not disparate;
their general corporate actions are
guided or determined not by two separate
corporate consciousnesses, but one. . .
. [And] [t]hey share a common purpose
whether or not the parent keeps a tight
rein over the subsidiary . . . .

Id. at 771. The Court added that a "corporation has

complete power to maintain" a portion of the enterprise

-8- 8

either in the form of an unincorporated division, or in the

form of a separately incorporated subsidiary. But, the

economic, legal, or other considerations
that lead corporate management to choose
one structure over the other are not
relevant to whether the enterprise's
conduct seriously threatens competition.

Id. at 772. For these reasons, the Court held,

the coordinated activity of a parent and
its wholly owned subsidiary must be
viewed as that of a single enterprise
for purposes of 1 of the Sherman Act.

Id. at 771.

Although the Court spoke of Sherman Act 1 and of

"coordinated activity," its reasoning applies here. See

Areeda & Kaplow, supra, 601(c), at 929. In essence, the

Court saw an identity of economic interest between parent

and wholly owned subsidiary that, considered in terms of the

economically oriented antitrust laws, warrants regarding

them as one. See generally 7 Phillip E. Areeda, Antitrust

Law 1464 (1986). Any claimed instance of truly

"independent," owner-hostile, subsidiary decisionmaking

would meet with the skeptical question, "But, if the

subsidiary acts contrary to its parent's economic interest,

why does the parent not replace the subsidiary's

management?" Given the strength of that joint economic

-9- 9

interest, we do not see how a case-specific judicial

examination of "actual" parental control would help achieve

any significant antitrust objective. Those instances in

which a wholly owned subsidiary would intend to act contrary

to the economic interests of its owner are likely few and

far between, and, if they ever exist, would seem hard to

prove. Cf. Areeda & Kaplow, supra, 215.

Second, there does not seem to be any special

Robinson-Patman Act purpose that a case-specific "control"

inquiry would further. To the contrary, one would not want

a seller to be able to defeat the statute's clear objectives

by transforming unlawful, into lawful, price discrimination

through the creation of a separately incorporated subsidiary

"distributor" that sells to the disfavored customers,

whether or not the parent retained "control" over the

pricing decisions of the subsidiary. Suppose, for example,

that M violates the Act by selling to one retailer (DBR) at

$10 and another competing retailer (R1) at $12. M should

not be able to avoid the law simply by creating a wholly

owned, but "independent" D, to whom it sells at $10, knowing

that "independent" D will (say, for profit-maximizing

reasons) "independently" resell to R1 at the same $12 price.

-10- 10

We are aware that this area of the law is filled

with difficulty. For example, should Robinson-Patman Act

liability attach in the example just given if (contrary to

our assumption) the wholly owned distributor, D, really

fulfills an important distribution function, necessary to

supply R1, but not needed in the case of sales to DBR, such

that DBR "ought" to receive a lower price? Or, suppose M

(perhaps as here) sets a higher price to direct buyers in

order to discourage direct sales and thereby to encourage

the creation of an independent distribution network? These

problems arise, however, in part, because it is difficult to

reconcile the Robinson-Patman Act's strictures with

traditional practices of corporations that seem to make

sense from a practical viewpoint. See, e.g., Texaco Inc. v.

Hasbrouck, 496 U.S. 543, 559-62 (1990); Kintner & Bauer,

supra, 22.14; James F. Rill, Availability and Functional

Discounts Justifying Discriminatory Pricing, 53 Antitrust

L.J. 929 (1985). And the complexity of Robinson-Patman Act

law has increased as courts have tried to introduce a degree

of flexibility into the Act as applied. See, e.g., Kintner

& Bauer, supra, 25.7, at 454-460 (discussing the

availability defense); Hasbrouck, 496 U.S. at 561

-11- 11

(discussing functional discounts); 15 U.S.C. 13(a) (cost

justification defense); see also Rill, supra.

For present purposes, however, we need only note

that these same problems exist, in one form or another,

regardless of our holding in this case. That is to say, a

contrary holding would nonetheless produce the same problems

wherever M does "control" the pricing policies of its

wholly-owned subsidiary D (i.e., in most cases). And, in

the remaining cases (where wholly-owned D is somehow

nonetheless "independent"), various other, related,

Robinson-Patman Act problems would often arise if DBR

complained about differences in price between M's price to D

and M's price to DBR. See pp. 12-14, infra. Thus, we find

nothing special in the Robinson-Patman Act context that

militates against Copperweld's reasoning or result.

Third, applying Copperweld avoids a potential

anomaly. A majority of courts, using a Copperweld-type

analysis, have held that a firm M's sale of a good to a

wholly owned subsidiary D is not a "sale" for Robinson-

Patman Act purposes; rather, it is simply a transfer; and

that is so whether D is, or D is not, somehow "independent"

in reality. See City of Mt. Pleasant v. Associated Elec.

Coop., Inc., 838 F.2d 268, 278 (8th Cir. 1988); Russ' Kwik

-12- 12

Car Wash, Inc. v. Marathon Petroleum Co., 772 F.2d 214, 221

(6th Cir. 1985) (per curiam) (quoting Copperweld, 467 U.S.

at 772 n.18); O'Byrne v. Checker Oil Co., 727 F.2d 159, 164

(7th Cir. 1984); Security Tire & Rubber Co. v. Gates Rubber

Co., 598 F.2d 962, 965-67 (5th Cir.), cert. denied, 444 U.S.

942 (1979). These holdings mean that D, the transferee, is

not a "purchaser" from M, and, for that reason, M does not

violate the Act even if he sells the same good to a direct

buying retailer (DBR), or even a direct competitor of D, at

a higher price than the price at which he "transfers" the

good to D. Our holding today means that when the wholly-

owned subsidiary D resells the good to R1, it must do so at

a "nondiscriminatory" price, i.e., at a price that would be

permissible under the Act had D's sale to R1 been made by M.

Thus, if M sells to DBR at 14, D cannot sell to R1 for less

than 14 (assuming, of course, that all other Robinson-Patman

Act liability conditions are met and no defenses are

available).

But, suppose we were to hold the contrary.

Suppose that we were to hold that a wholly-owned subsidiary

D and its owner M were not a "single seller" where D was

somehow nonetheless "independent." Then, an anomalous

difficulty might well prevent DBR from bringing an action

-13- 13

where M "transfers" to D at 10, D resells to R1 at 12, but M

insists on charging DBR 14 (i.e., approximately the

allegations before us). The doctrine just mentioned -- in

effect finding that M and D are a single entity for purposes

of the transfer between them -- would prevent DBR from

complaining about the effect of the M-D "transfer." Cf.

Hasbrouck, 496 U.S. at 569-71. At the same time, our

(imagined) holding (the opposite of our actual holding) that

M and D were not a single entity for purposes of D's sale to

R1 would likely prevent DBR from complaining about the

effect of that sale because of its inability to find a

single "person" who discriminated (because M does not sell

to R1, while D does not sell to DBR, see pp. 12-13, supra).

Perhaps one could somehow avoid this anomaly in

other ways, but it seems undesirable to invent epicycles in

an already too complex area of the law. It is simpler to

hold in parallel fashion that ownership alone makes a

"single seller" of a firm and its wholly owned distributor,

just as ownership alone eliminates the possibility of a

Robinson-Patman Act "sale" between them.

We therefore find it appropriate to apply

Copperweld's reasoning outside Sherman Act 1. See, e.g.,

-14- 14

City of Mt. Pleasant, 838 F.2d at 278; Russ' Kwik Car Wash,

772 F.2d at 221; cf. United States v. Waste Management,

Inc., 743 F.2d 976, 979 (2d Cir. 1984) (attributing

subsidiary's activity to parent for purposes of Clayton Act

7). We hold that BMW AG's ownership of BMW NA makes of

those two entities, for Robinson-Patman Act purposes, a

single seller.

We now turn to a second, independent reason the

district court gave for concluding that the complaint did

not adequately state a Robinson-Patman Act claim. The court

correctly noted that if a seller makes its favorable prices

and terms available to an otherwise disfavored customer,

that customer has no legal right to complain. See, e.g.,

Bouldis v. U.S. Suzuki Motor Corp., 711 F.2d 1319, 1326,

1328-29 (6th Cir. 1983) (discussing availability defenses to

2(a), 2(d), and 2(e)); Shreve Equip., Inc. v. Clay Equip.

Corp., 650 F.2d 101, 105-06 (6th Cir.) (discussing

availability under 2(a)), cert. denied, 454 U.S. 897

(1981); Edward J. Sweeny & Sons, Inc. v. Texaco, Inc., 637

F.2d 105, 120-21 (3d Cir. 1980) (same), cert. denied, 451

U.S. 911 (1981); see also Kintner & Bauer, supra, 25.7.

The district court then concluded that Caribe, in a portion

of its complaint, in effect conceded that BMW made its

-15- 15

favorable prices and terms available to Caribe. That

complaint portion says that in 1987

despite Caribe's remarkable success, BMW
attempted to convert Caribe from being
an importer-retailer purchasing directly
from the factory to being a mere retail
dealer purchasing from BMW N.A.

We do not believe, however, that one can draw from

this statement the "availability" concession that the

district court found. The complaint also says that

[u]nbeknownst to Caribe, and beginning
by at least 1987, BMW began lowering its
prices for BMWs sold to Caribe's
competitors and offering those
competitors other economic advantages
while maintaining its prices to Caribe
at a discriminatorily high level and not
making the other economic advantages
available to Caribe on proportionately
equal terms.

The emphasized language says that Caribe did not know that

its competitors were receiving favored treatment. And, we

do not see how ordinarily one could say that a seller has

made favored treatment "available" to a disfavored customer

if the disfavored customer does not know about the favored

treatment. See, e.g., Alterman Foods, Inc. v. FTC, 497 F.2d

993, 1001 (5th Cir. 1974); Mueller Co. v. FTC, 323 F.2d 44,

46-47 (7th Cir. 1963), cert. denied, 377 U.S. 923 (1964);

Century Hardware Corp. v. Acme United Corp., 467 F. Supp.

350, 355-56 (E.D. Wis. 1979). .

-16- 16

Caribe also argues that the favored treatment, as

a practical matter, was not "available" because BMW AG

insisted that it give up various advantages of its

importer's contract in order to obtain it. We cannot tell

from the complaint, however, just what those advantages were

and how they related to the practical "availability" of the

favorable treatment given other retailers. Thus, we cannot

say, at this time, whether or not Caribe will be able to

prove that the favorable price and terms, as a practical

matter, were not available. At this stage, however, Caribe

has sufficiently alleged that they were not.

Our conclusion is that Caribe's complaint states a

valid Robinson-Patman Act claim, in respect to price

discrimination under Robinson-Patman Act 2(a), and for

similar reasons, under the Robinson-Patman Act sections that

deal with payments for services, furnishing services, and

brokerage payments. 15 U.S.C. 13(b), (d)-(e). Although

Caribe's pleadings regarding these other Robinson-Patman Act

sections are rather sparse, they are sufficient to give BMW

AG and BMW NA notice of the substance of Caribe's complaint.

Caribe also claimed that BMW NA violated 2(f), which

forbids knowingly inducing or receiving a discrimination in

price. 15 U.S.C. 13(f). In light of our holding that BMW

-17- 17

NA is not a separate "person," however, that portion of the

complaint must be dismissed.

III

The Sherman Act

Count Two of the Complaint says that

BMW has for years imposed as a secret
condition of Caribe's contracts an
agreement or understanding that Caribe
charge its customers prices set by BMW.
. . . More specifically, BMW threatened
to terminate Caribe's contracts unless
Caribe agreed not to raise its margins
(i.e., and thus its retail prices) above
levels fixed and set by BMW, and Caribe
reluctantly agreed.

This complaint sets forth a claim that BMW and Caribe agreed

to fix "maximum" resale prices. The Supreme Court has held

that Sherman Act 1 forbids this kind of agreement. See

Albrecht v. Herald Co., 390 U.S. 145 (1968). The complaint

also alleges that the "agreement caused Caribe to lose

additional profits." And, Clayton Act 4 permits any

"person" whose "business" is "injured" by "reason of

anything forbidden in the antitrust laws" to recover treble

damages. 15 U.S.C. 15.

The district court nonetheless dismissed the

complaint in light of Clayton Act 4's requirement that the

injury must result from an action that the antitrust laws

forbid. The courts have held that this requirement means

-18- 18

the injury itself must be a special "antitrust injury,"

which is to say that it must amount to "the type" of harm

"the antitrust laws were intended to prevent," and it must

flow "from that which makes [the] defendants' acts

unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429

U.S. 477, 489 (1977) (emphasis added). The district court

thought that Caribe's lost profits were not the "type" of

harm that the anti-maximum-resale-price-fixing rule seeks to

prevent. And, it rested that conclusion upon its reading of

a Supreme Court case, Atlantic Richfield Co. v. USA

Petroleum Co. ("ARCO"), 495 U.S. 328 (1990).

As the district court pointed out, in ARCO the

Supreme Court considered the anticompetitive possibilities

that had earlier led the Court to find maximum resale price

agreements unlawful. The Supreme Court referred to three.

First, the "maximum" resale price agreement might be, in

reality, a disguised "minimum" resale price agreement, in

which case the agreement would threaten the very kinds of

harm that led the Court, in Dr. Miles Medical Co. v. John D.

Park & Sons Co., 220 U.S. 373 (1911), to find minimum resale

price agreements unlawful per se. ARCO, 495 U.S. at 336.

Second, a maximum resale price agreement might prevent a

dealer from providing "services and conveniences" that

-19- 19

customers would want to the point that the customers would

accept (if necessary) the price increases needed to provide

them. Id. at 335-36. If so, a supplier's judgment about

the proper resale price (imposed through the supplier's

maximum resale price agreement) would prevent consumers from

obtaining what they want (higher quality product) from

retailers who would like to supply it. Id. Third, a

"maximum resale price agreement" might "'channel

distribution through a few large or specifically advantaged

dealers,'" the only ones able to earn a profit at the

mandated, low resale price. Id. at 336 (quoting Albrecht,

390 U.S. at 153).

The Supreme Court went on to hold that the ARCO

plaintiffs had not suffered "antitrust injury." But it

noted, and we note, that, unlike Caribe, the ARCO plaintiffs

were not dealers who themselves had entered into (or been

forced to enter into) such agreements; rather they were the

competitors of those dealers. They had claimed that the

agreements had helped the ARCO dealers (who entered into the

agreements) obtain more sales, thereby leaving them, the

competitors of the ARCO dealers, with fewer sales for

themselves. The Supreme Court held that, whatever else

might be wrong with the plaintiffs' assertion, it did not

-20- 20

allege harm of the type that Albrecht sought to prevent.

That kind of harm would have taken the form of fewer ARCO

dealers, or fewer sales for the dealers who had entered into

the agreements (because those customers wanting higher

prices and extra services could not get them), not more ARCO

dealer sales. The Supreme Court then wrote that the

plaintiffs, being rival dealers, were

benefited rather than harmed if [ARCO's]
pricing policies restricted ARCO sales
to a few large dealers or prevented
[ARCO's] dealers from offering services
desired by consumers such as credit card
sales.

Id. at 336-37. The Court added that if an agreement

lowers prices but maintains them above
predatory levels, the business lost by
rivals cannot be viewed as an
"anticompetitive" consequence of the
claimed violation.

Id. at 337 (emphasis added).

In this case, Caribe is not in the same position

as the ARCO plaintiffs, for Caribe is the very firm that the

alleged maximum resale price fixing agreement forced to keep

its price below the level it preferred to set. At least in

theory, if customers would have preferred a higher price and

consequently better product quality or greater service, the

agreement forced Caribe to provide less of what they wanted;

the agreement thereby might have led to lower Caribe

-21- 21

profits. And, at least in theory, if the agreement helped

other, larger BMW dealers, Caribe is the firm that would

have suffered. Thus, Caribe's complaint here alleges

antitrust harm of the "type" that Clayton Act 4 authorizes

it to assert. ARCO supports, it does not deny, Caribe's

standing.

We recognize that Albrecht has proved a

controversial case. That is, in part, because it seems to

outlaw not only anticompetitive uses of maximum price

fixing, but also procompetitive uses as well, namely, use of

a maximum resale price agreement that protects consumers

from the exercise of a retailer's monopoly power. See,

e.g., 8 Phillip E. Areeda Antitrust Law 1636 (1989). And

insofar as Caribe's claim of "lost profits" refers to

"losses" that occurred because the agreement prevented

Caribe from raising prices above the competitive level, it

is at least arguable that no "antitrust injury" occurred.

See id. 1640; Phillip E. Areeda, Antitrust Law 340.3b,

at 509-510 (Supp. 1993). But, at this stage of the

proceeding, we must view Caribe's complaint in a favorable,

not an unfavorable, light. We therefore read the complaint

as implying that the agreement cost Caribe profits because

it inhibited Caribe from selling to those potential BMW

-22- 22

customers who would have preferred higher quality service,

even if that meant somewhat higher Caribe prices.

We recognize that one might also wonder, as did

the district court, how Caribe could have been injured both

by a Robinson-Patman Act violation and by a maximum resale

price agreement. How could it have suffered lost customers

attracted by the lower prices of retailers who bought

cheaply from BMW NA and also have suffered lost profits

because it could not increase its prices? One might answer

this question, however, by inferring from the complaint that

Caribe has two different kinds of customers. Some want to

pay the lowest possible prices; others would pay more to

receive special services that Caribe would offer only if it

could charge higher prices. At least in principle,

possibilities of this sort are not outlandish. And, it

seems to us that Caribe is entitled to have a court draw

these inferences at this complaint stage of the proceeding.

Hospital Bldg. Co. v. Trustees of Rex Hospital, 425 U.S.

738, 746 (1976); Conley v. Gibson, 355 U.S. 41, 45-46

(1957); Tri-State Rubbish, Inc. v. Waste Management, Inc.,

998 F.2d 1073, 1081 (1st Cir. 1993).

We conclude that the district court should not

have dismissed count II of the complaint.

-23- 23

IV

Puerto Rico Antitrust Claims

Caribe asserted claims under Puerto Rico's

antitrust law that parallel its federal antitrust claims.

As the parties seem to agree, courts interpret Puerto Rico's

laws as essentially embodying the jurisprudence relevant to

the parallel federal law. For that reason we reinstate the

Commonwealth antitrust claims to the same extent that we

have reinstated the federal claims. Cf. R.W. Int'l Corp. v.

Welch Food, Inc., No. 93-1704, slip op. at 19-25 (1st Cir.

Jan. 20, 1994); Mitsubishi Motors Corp. v. Soler Chrysler-

Plymouth, 723 F.2d 155, 161 (1st Cir. 1983), aff'd in part

and rev'd in part, on other grounds, 473 U.S. 614 (1985).

V

The Contract Claims and the Act 75 Claim

Our antitrust count decisions require the district

court to reconsider its remaining dismissals, of Caribe's

breach of contact claims and its Act 75 claim. The district

court dismissed those counts because of a forum selection

clause in the Caribe contracts, which says

the exclusive jurisdiction for disputes
concerning the . . . termination of this
agreement as well as all and any rights
and duties arising out of this agreement
is . . . Germany.

-24- 24

The court did not decide, however, whether or not this

clause covers antitrust counts (for it had dismissed those

counts for failure to state a valid claim). We cannot tell

from the wording of the clause alone whether it does, or

does not, cover antitrust claims -- whether such claims

"concern" the "termination" of, or "rights and duties

arising out of," the "agreement." And, it seems to us that

the parties should have an opportunity to pursue that

question further in the district court. Compare Mitsubishi

Motors, 723 F.2d at 159-61 (analyzing numerous provisions in

contract to determine intended scope of a forum selection

clause) with Bense v. Interstate Battery Sys. of Am., Inc.,

683 F.2d 718, 720 (2d Cir. 1982) (broadly worded forum

selection clause includes antitrust claims).

The answer to this question, depending upon what

it is, might add strength to (or weaken) plaintiff's

argument that the forum selection clause cannot apply to the

Act 75 claim. It also could affect the arguments about the

comparative "convenience" of Puerto Rico for a trial on the

contract and Act 75 claims. Were it to turn out, for

example, that an antitrust trial had to take place anyway in

Puerto Rico, the comparative balance of conveniences might

well change.

-25- 25

We do not mean to express any view, however, on

the merits of these or other arguments (such as

jurisdictional arguments) that the parties may make as the

case proceeds further. We simply hold that the district

court should not have dismissed the antitrust claims in the

complaint. And, that holding, in turn, requires the court

to reconsider its other dismissals.

The judgment of the district court is vacated and

the case is remanded for further proceedings.

So ordered.

-26- 26